Central Paper Company, Incorporated v. Commissioner.
Central Paper Co. v. Commissioner
Docket No. 1829.
United States Tax Court
1945 Tax Ct. Memo LEXIS 217; 4 T.C.M. (CCH) 469; T.C.M. (RIA) 45161; April 30, 1945
Wilbur A. Giffen, Esq., 110 S. LaSalle St., Chicago, Ill., for the petitioner. Lester M Ponder, Esq., for the respondent. STERNHAGEN The Commissioner determined deficiencies for the year ended June 30, 1940, of $7,886.24 in income taxes and $6,517.56 in declared value excess profits tax. Taxpayer assails the determination that income of $49,982.56 was realized upon the surrender by it of trustee's certificates for cancellation; and also affirmatively claims a deduction, not heretofore claimed, for loss of $426,809.12 upon the liquidation of the trust. Findings of Fact The taxpayer, a Michigan corporation, was incorporated on February 6, 1935, pursuant to a plan of reorganization under Section 77B of the National Bankruptcy Act, approved by the District Court of the United States for the Western *218 District of Michigan. Its predecessor, the Central Paper Company, a Michigan corporation (hereinafter called the old company), was dissolved immediately after February 6, 1935. Both corporations were engaged in the manufacture of pulp and paper at Muskegon, Michigan. In the order dated January 28, 1935, confirming the modified plan of organization, the District Court found, inter alia, that the "Central Paper Company, Debtor [the old company], is not insolvent under the provisions of the Acts of Congress Relating to Bankruptcy". The taxpayer, as it concedes, "was in a solvent financial condition at all times material to this case". Pursuant to the approved reorganization plan, taxpayer acquired all the assets and liabilities of the old company and issued therefor to the holders of outstanding shares, and of bonds, and creditors of unsecured indebtedness existing prior to January 1, 1931, of the old company, its own shares, bonds and notes, as follows: Taxpayer
Old Company
7,014 shares common $1 par
150,305 shares no par common
33,750 shares common $1 par
30,000 shares 8% preferred $10 par
60,000 shares common $1 par
60,000 shares 7% preferred $10 par
3%-6% first mortgage bonds, Principal amount
6 1/2% first mortgage bonds, Principal amount
$860,000
$860,000
21,500 shares cumulative 3%-6% voting preferred,
Accrued interest thereon
convertible into common, $10 par
32,130 shares cumulative 3%-6% voting preferred,
First and general mortgage 7% sinking fund
non-convertible, $10 par, to a trustee for the
bonds, Principal amount $321,300
holders of convertible trustee's certificates
8,032.5 shares cumulative 3%-6% voting pre-
Interest thereon of $80,325
ferred, convertible into common, $10 par
10,010 shares cumulative 3%-6% voting preferred,
Unsecured creditors, $131,222
convertible into common, $10 par, and $31,122
five-year notes
*219 Current liabilities were payable in cash. Taxpayer's first mortgage bonds were secured by a first lien upon all of its mortgageable property, except its Canadian timber licenses and Canadian freehold lands. The balance sheet as of January 31, 1935, shown in the income tax return of the old company for the period July 1, 1934, to February 6, 1935, and the balance sheet as of February 6, 1935, as shown in the income tax return of the taxpayer for the period ended June 30, 1935, were the same except as noted below: Old Company
Taxpayer
Assets
As of 1/31/35
As of 2/6/35
Cash
$ 103,941.29
Notes receivable
2,896.44
Accounts receivable
198,555.11
Inventories
391,512.36
Other investments: Stocks of domestic corporations
2,754.31
Deferred charges
19,481.81
Capital Assets:
(Same)
Land
$ 34,541.62
Buildings
1,024,325.24
Machinery and equipment
2,455,226.29
Furniture and fixtures
6,574.87
Dwellings
51,055.16
Boats
1,500.00
Timber rights
617,831.49
4,191,054.67
Less Reserve for Depreciation
2,003,568.24
2,187,486.43
Unamortized bond expenses
17,657.09
Total Assets
$2,924,284.84
$2,924,284.84
Liabilities
Notes payable (less than one year)
$ 42,465.81
Accounts payable
237,290.45
Mortgages
1,181,300.00
Accrued expenses:
(Same)
Payroll
12,924.56
Interest
309,634.99
Taxes
97,253.26
Federal capital stock tax
497.00
Reserve for federal income and excess profits taxes
6,342.24
Total liabilities other than stock liability
$1,887,708.31
$1,887,708.31
Capital Stock: Preferred stock (less stock in treasury)
900,000.00
Common stock (less stock in treasury)
601,220.00 *
100,764.00
Surplus or (Deficit) and Undivided profits
(464,643.47)
935,812.53
$2,924,284.84
$2,924,284.84
*220 Thereafter, the timber rights of $617,831.49 were shown as an asset on the balance sheets in taxpayer's income tax returns beginning with the balance sheet as of July 1, 1935, to and including the balance sheet as of July 1, 1939, in the return for the year ended June 30, 1940, offset by "Reserve for depletion" in the same amount. Taxpayer's balance sheet as of June 30, 1935, shows that mortgages were reduced from $1,181,300 to $860,000, and that in addition to the $100,764 par common $716,725 par preferred were then outstanding. Pursuant to the reorganization plan and court order taxpayer made a trust indenture dated February 1, 1935, in which it transferred to a trustee All Canadian timber licenses, Two parcels freehold in the Thunder Bay District, Ontario, comprising 212 acres, together with improvements, and 32,130 shares of its 3%-6% cumulative non-convertible preferred, $10 par. The trustee was to issue in *221 exchange, par for par, for the 7% bonds of the old company 3%-6% cumulative certificates of beneficial interest, face amount $321,300, dated February 1, 1935, maturing October 1, 1948, indicating the interest of the holders in the Canadian timber licenses, freehold lands and preferred shares and any and all other property held by the trustee from time to time. The taxpayer agreed to establish a "Sinking Fund B" for the payment of principal or interest on the certificates beginning with the fiscal year ending June 30, 1936, by the payment of a certain percentage of its net profits payable in cash or "in whole or in part by the delivery to the Trustee of any Certificates secured hereby, taken at their actual cost to the Company"; and to establish a "Sinking Fund C" for the payment of principal of certificates and retirement of its cumulative preferred shares whenever $543,000 of its first mortgage sinking fund bonds had been paid or retired. Whenever the "C" fund amounted to $10,000 or more, it was to be applied to the purchase of certificates or preferred shares "at the lowest per cent of their then principal holders, the moneys in the C fund were to be paid immediately to the trustee *222 until the principal amount of all certificates and interest was paid in full. Any moneys paid to the trustee under the requirement of Funds B and C were amount or par value respectively". If no certificates or preferred shares were offered by the to become a part of the trust estate. The taxpayer further agreed to assist the trustee and use its own best efforts to maintain and extend the Canadian timber licenses and to pay to the trustee all fees and governmental charges on such licenses and necessary expenses of protecting the same; to pay to the trustee, in the event of the loss or termination of such licenses, $25,000 in five annual $5,000 installments; and to pay to the trustee compensation for services in the execution of the trust and all expenses of administration. The taxpayer had the option at any time prior to October 1, 1948, to pay to the trust a sum sufficient to pay the then principal amount of all outstanding certificates, together with unpaid interest and trustee's fees and expenses, and to receive a reconveyance of all properties and securities remaining in the trust estate after certificate holders had been given an opportunity to exercise their rights of conversion *223 into non-convertible preferred shares. Certificates delivered by taxpayer to the trustee in lieu of cash payments for the sinking fund were to be cancelled. If all certificates were paid in full or cancelled before October 1, 1948, all properties and securities and cash remaining in the trust estate were to be turned over to the taxpayer and the trust terminated. Certificate holders had the option of converting certificates into shares of cumulative preferred of par value equal to the principal amount of the certificates. The certificates so converted were to be cancelled. Upon conversion of certificates into preferred shares no allowance was made for any interest accrued on the certificates at the time of conversion. The 32,130 shares of preferred transferred to the trustee were not to be repurchased by taxpayer for less than 105% of par, plus accrued dividends, but taxpayer could retire such shares upon delivery to the trustee of certificates in face amount equal to par of the preferred shares to be retired. All receipts from timber and licenses, all dividends on the preferred, and all money received by the trustee from any source for the benefit of the holders of the certificates *224 were to be used, first, for the payment of interest on the certificates, and, second, to reduce the face amount thereof by pro rata distribution among the certificate holders, except that the trustee could retain such funds as necessary to protect the property for the benefit of the certificate holders. The certificate was in part as follows: "This Certificate is one of a duly authorized issue of Central Paper Company, Incorporated, Convertible Trustee's Certificates of like date and tenor (except as to distinguishing numbers and denominations) limited to the aggregate principal amount of Three Hundred Twenty-one Thousand Three Hundred Dollars ($321,300), and issued under and equally and ratably secured by, an indenture dated as of February 1, 1935, made by and between Central Paper Company, Incorporated, a Michigan corporation (hereinafter called the 'Company') as party of the first part, and the Trustee as party of the second part * * *. * * * * *
"No obligation shall be asserted or be enforcible against the Trustee or the Company, or either of them, to pay this Certificate or any interest accrued thereon, and each original and successive holder of this Certificate accepts *225 the same upon the express condition that the sole remedy of such holder shall be by recourse to the properties, securities and/or cash in the trust estate held by the Trustee as security for the Certificates of this issue under and subject to the terms of said Indenture and in the manner therein set forth." Unless sooner terminated by the cancellation of all outstanding certificates, the trust was to terminate as soon as practicable after October 1, 1948, by the distribution of the trust estate pro rata among the registered holders of outstanding certificates at that time. There were about 80 holders of trust certificates. The Canadian timber licenses and lands were acquired by the old company in 1923 by assignment from Nyando Pulp and Paper Corporation, to which the licenses for a period of one year had been issued by the Canadian Government in 1923. At the time of this acquisition, the old company issued $600,000 par value 7% preferred, of which $586,610 was shown on the books to have been issued to Manufacturers Paper Company for the licenses. On the books, $570,000 was charged to an asset called Timber Limits, of which $498,295.92 was charged to timber rights or licenses, $4,240 *226 to lands, and $67,464.08 to improvements. On this asset account was charged in 1924 "Common Stock $100,000". On June 30, 1924, the debit balance in such account as shown on the books was $673,693.41. The book assets and liabilities of the old company as of the beginning and end of the year ended June 30, 1924, were as follows: July 1,
June 30,
Assets
1,23
1924
Cash
$ 96,359.25
$ 166,887.23
Notes receivable
10,000.00
Accounts receivable
463,844.76
467,444.09
Inventories
1,056,870.66
1,033,612.91
Investments (Stocks and Bonds)
4,200.00
6,200.00
Deferred Charges
90,854.27
156,865.97
Land and Buildings
487,742.67
814,617.54
Machinery and Equipment
553,018.82
1,605,617.16
Construction in Process *
653,682.47
Furniture and Fixtures and Vessels
23,782.39
23,003.84
Timber Lands (Michigan)
44,914.36
Timber Lands (Canadian)
673,693.41
Proceeds of Mortgaged Property Sold
85,000.00
Less reserves for depreciation and depletion
None
None
Proceeds from sale of bonds reserved for plant extension
280,752.80
Suspense
10,120.13
Total Assets
$3,776,142.58
$5,039,421.40
Liabilities
Notes payable
$ 370,306.74
$ 562,500.00
Accounts payable
75,255.34
57,562.38
Accrued Interest on Bonds
17,875.00
21,375.00
Accrued Taxes, State, County and City
25,000.00
25,000.00
Accrued Federal Income Tax
22,974.93
1st Mortgage 6 1/2% Serial Bonds
1,100,000.00
1,100,000.00
2nd Mortgage 7% Gold Bonds
600,000.00
Capital Stock
Preferred
600,000.00
Common
1,400,000.00
1,503,030.00
Surplus and undivided profits
764,730.57
569,954.02
$3,776,142.58
$5,439,421.40
*227 As of February 6, 1935, there was in the Timber Rights account on the books of the old company a debit balance of $675,671.49. In its return for the period ending January 31, 1935, the old company deducted a loss of $50,340, stating "a charge off of cost of equity in timber rights located in Canada, said equity claimed by Canadian authorities, under date of December 27, 1934, to have been forfeited by the taxpayer for failure to carry out salvage operations in removing burned timber on fire areas on acreage known as Berths A-1, A-2 and Green Berth. "The Canadian timber rights were purchased in 1923 at a cost of $686,510.00 being paid for by the issuance of $586,610.00 of preferred stock and $100,000.00 of common stock. Subsequent minor adjustments of fire losses and small sales of timber resulted in an adjusted cost of this property as at June 30, 1934 at $668,171.49. * * *" The loss of $50,340 was stated to represent the cost, included in the total cost of $668,171.49, of 10,068,000 board feet of white *228 pine saw logs, located on Berths A-1, A-2 and Green Berth. In about August, 1933, timber on Berths A-1 and A-2 was damaged by fire. The old company, being required by the licenses to salvage the damaged timber, failed to do so. After April 30, 1932, the old company delayed payment of the 1932-1933 ground rent and fire tax payable upon the renewal of its Canadian licenses, which were renewable from year to year. Such rent and tax, together with the rent and tax for the 1933-1934 licenses, were paid December 12, 1933. A letter to the old company dated September 11, 1934, from the Ontario Department of Lands and Forests stated: "In your letter of May 21, 1934, you made reference to an Order-In-Council being made regarding an extension of time on your limits. In this connection I would inform you that the Department did not feel justified in making any arrangements for this Order until such time as the salvaging of this timber [damaged by fire in 1933] had been settled." Further negotiations with the Ontario Department of Lands and Forests resulted in an Order-In-Council dated May 1, 1935, stating that on February 15, 1935, the rights of the "Central Paper Company" "to the Pine *229 and Cedar log and tie timber on the Green Berth and on Berths A-1 and A-2, subject to the payment of certain prices," had been cancelled but that the company's former cutting rights, subject to conditions stated were extended for three years, or until April 30, 1938, "on all the limits except A-1, A-2 and part of the Green Berth on which last three mentioned berths their rights shall be limited only to the pulpwood, and that they shall be privileged to cut the pulpwood on Part Berth 8 at such prices as may be fixed by the Minister of Lands and Forests." Thereafter, annual licenses for the years ended April 30, 1936, and 1937, were granted, dated May 10, 1935, and May 1, 1936, to "Central Paper Company" on the original eight timber areas but the rights on the three areas designated as Berths A-1, A-2 and Green Berth, were limited to the cutting of pulpwood. The aforesaid deduction for loss of $50,340 taken by the old company in its return for the period ending January 31, 1935, was allowed in full by the Commissioner. It is conceded by taxpayer that the cost of the Canadian timber limits should be reduced from acquisition to February 6, 1935, by the above $50,340 and the following: *230 $1,272.12 credited to Timber Rights account as of June 30, 1934, representing net recovery in suit for damage to timber and depreciable assets. 577.34 representing proceeds from sale of stumpage sold, of which $336.78 was credited to Timber Rights account as of June 30, 1934. 2,932.50 representing proportionate part of original cost applicable to pulpwood on Block A-1 damaged by fire in May, 1933. Additional credits were made to the "Canadian Timber Limits" account as follows: (1) Monthly credits during the six months ended December 31, 1924, totalling $1,563.02, which represented receipts from sale of laths, lumber on hand, and supplies acquired when the sawmill property was acquired in 1923. Except for these sales there were no other operations from December, 1923, to February 6, 1935. (2) Credit as of November 30, 1926, of $550, representing recovery from fire loss related to depreciable assets, credit as of June 30, 1930, of $700, representing sale of machinery and equipment, and credit as of June 30, 1935, of $7,500, representing down payment received in August, 1929, pursuant to a contract for sale of timber on Green Berth, Berth A-2 and westerly part of Berth A-1. The *231 contract was abandoned and the down payment forfeited. It is stipulated that of whatever amount is determined by this court as the original cost to the old company of the aggregate Canadian timber licenses and 212 acres and buildings, etc., pertaining thereto, 89% should be allocated to Canadian timber licenses and 11% to the lands, buildings and equipment. Under date of April 3, 1937, the trustee made an agreement with Edward E. Johnson, of Fort William Ontario, reciting that "the said Central Paper Company is the holder of the certain timber cutting rights in the vicinity of Savanne, Ontario, covering" areas under the eight licenses, assigning to him the title of the trustee and all the title of the "Central Paper Company" in the above licenses, together with the rights thereafter conveyed to the Central Paper Company pursuant to a letter dated February 26, 1937, from the Minister of Lands and Forests of Ontario pertaining to timber upon Gravel River Watershed in the Thunder Bay District, for $50,000, of which $2,500 was payable forthwith, $6,500 January 31, 1938, five payments of $6,700 each on July 31, 1938, January and July 31, 1939 and 1940, and the balance of $6,500 on January 31, 1940. *232 The agreement further provided that Johnson was to transfer to the trustee whatever timber cutting rights he had or would acquire to the jackpine timber upon the watershed of the Little Pic River, Province of Ontario, under an agreement dated February 25, 1937, and "in the event that the jackpine timber upon the said watershed available for cutting is less than 100,000 cords, the Purchaser agrees to pay to the Trustee the sum of Twenty-five Cents (25") for each cord less than 100,000. In the event that such shortage is caused by ravages of insects, blow-down, or fire, or any other cause beyond the control of the Purchaser, then this undertaking as to minimum quantity shall be void and of no effect, and the Trustee shall take whatever jackpine remains upon said area in satisfaction of his rights under this clause. The Purchaser will permit the Trustee to have the use of his river improvements in the cutting and removing the jackpine, provided for in this paragraph, upon payment to the Purchaser of the usual tolls as provided under the terms of the Lakes and Rivers Improvements Act, R.S.O. 1927, Chapter 43. The Trustee agrees to pay to the Purchaser the Trustee's pro rata share of *233 the ground rent and the fire protection charges in proportion to the standing timber now upon the area. * * * * *
"In the event that the purchaser is unable to complete the conveyance of the jackpine timber to the Trustee as provided by Paragraph 2 hereof, then he shall pay to the Trustee the sum of Twenty-five Thousand Dollars ($25,000.00) in cash in substitution of such jackpine timber." The balances due on the above contract were as follows: June 30, 1937
$46,500.00
Dec. 30, 1937
46,500.00
June 30, 1938
40,000.00
Dec. 30, 1938
33,300.00
June 30, 1939
26,600.00
Dec. 30, 1939
19,900.00 Upon final liquidation of the trust in May, 1940, there was a net balance due of $10,948.59. The cutting rights to be transferred under the above agreement were not transferred by Johnson to the trustee up to May, 1940, or to taxpayer up to March 31, 1942. A new trustee under the trust indenture, J. Ward Hartke, was appointed in April, 1938. Shortly thereafter he made a study of the jackpine timber cutting rights under the Johnson contract. He and taxpayer concluded that they were valueless because the cost would be excessive and timber could be purchased more cheaply. *234 In July, 1934, the sawmill building was half flooded, falling down and dilapidated; machinery had been removed; the planing mill was rapidly going to pieces and there was no machinery in it. The taxpayer purchased trustee's certificates during the fiscal years ended June 30, 1936, 1937, 1938 and 1939, which is turned over to the trustee in lieu of cash under the trust indenture at a cost as follows: Certificates
Cost
Par
to Trustee
1936
$ 7,457.75
$22,900.00
October
5, 1936
1937
15,520.00
15,300.00
October
6, 1937
1938
4,805.00
4,800.00
October
10, 1938
1939
6,238.00
6,300.00
October
3, 1939
$34,020.75
$49,300.00
The taxpayer also purchased trustee's certificates as follows: Cost
Par
1937
$ 59,330.12
$ 87,200.00
1938
30,251.00
33,400.00
1939
13,257.50
17,400.00
1940
63,593.40
70,900.00
$166,432.02
$208,900.00 On April 15, 1940, the $208,900 certificates were transferred to the trustee and thereupon 20,890 of the 3%-6% non-convertible cumulative preferred shares of taxpayer were transferred to it by the trustee. On April 5, 1940, taxpayer notified the trustee that it elected *235 to exercise its option to pay the trust the then principal amount of trustee's certificates outstanding, together with interest due. The trustee on April 6, 1940, notified all certificate holders that all certificates not converted prior to April 20, 1940, would be redeemed in cash at par with interest to April 20, 1940. $12,700 par of certificates were converted into preferred shares between April 6 and April 20, 1940, leaving then outstanding $50,400 certificates and $10,248 interest. On April 20, 1940, taxpayer paid to the trust $60,648 [$50,400 + $10,248] and the trustee retired the outstanding $50,400 par certificates in cash. After paying all expenses of the trust the trustee during May, 1940, distributed the remaining assets of the trust to the taxpayer in final liquidation and the trust was then terminated. Upon such liquidation, taxpayer received (1) Cash, $4,841.20, (2) Contract receivable, or the net balance due on the sale of the Canadian timber licenses to Johnson April 3, 1937, $10,948.59, (3) 9,970 shares of 3%-5% non-convertible cumulative preferred par, $99,700, (4) Canadian land, being the 212 acre sawmill site, (5) Improvements on above land, and (6) *236 Rights of trustee under agreement of April 3, 1937, with Johnson relating to timber cutting upon the watershed of the Little Pic River. The preferred shares received from the trustee were retired, resulting in a reduction of $308,600 in outstanding preferred. Of the interest paid by the trustee on outstanding trust certificates on March 28, 1939, of $27,160, and on October 1, 1939, of $8,187, taxpayer received $13,710 and $5,421, which were reported by it as taxable income for the years ended June 30, 1939, and June 30, 1940. No adjustment thereof was made upon audit by the Commissioner. The taxpayer received no part of the interest of $10,248 paid by the trust on May 8, 1940. Memorandum Opinion STERNHAGEN, Judge: 1. The taxpayer assails the Commissioner's inclusion in its 1940 income of $49,982.56, the explanation for which in the deficiency notice is as follows: It is held that taxable income was realized in the taxable year upon surrender of Trustee's Convertible Certificates for cancellation at an amount in excess of cost, and that you were in a solvent financial condition before and after the transaction. The adjustment is shown as follows: Income
Par Value
Cost
Realized
$208,900.00
$166,432.02
$42,467.98
50,400.00
44,858.21
5,541.79
6,300.00
4,327.21
1,972.79
Total
$265,600.00
$215,617.44
$49,982.56
*237 This determination is defended by the Commissioner on the doctrine of United States v. Kirby Lumber Co., 284 U.S. 1, that a debtor realizes income by the acquisition of its bonds or the cancellation of its debt for less than the amount of the obligation. The taxpayer says that this doctrine is inapplicable because, the trustee's certificates were not its debt; that they were acquired by it, not for less than the amount of its debt, but in exchange for its own preferred shares; and that such exchange was a capital transaction in which no gain was realized or is recognizable under the revenue act. This court is of opinion that under the 1935 reorganization plan the indebtedness of the old company's 7% mortgage bonds was assumed by the taxpayer, a solvent corporation, and a gain of $42,529.98 (not $49,982.56 as determined) was realized by the taxpayer in 1940 when it surrendered certificates to the trustee, as follows: Par
Cost
Gain
Oct. 3, 1939
$ 6,300.00
$ 6,238.00
$ 62.00
Apr. 15, 1940
208,900.00
166,432.02
42,467.98
$215,200.00
$172,670.02
$42,529.98 and that the exchange of trustee's certificates was not a non-recognition capital *238 transaction. The trustee's certificates were obligations of the taxpayer, which was, as not disputed, at all times solvent, and it is not necessary to consider the part of the Commissioner's argument which submits the proposition that the Kirby doctrine is no less effective to support the recognition of income to a taxpayer in the acquisition for less than par of obligations upon which it is not the obligor, except to say that we do not agree that the proposition is supported by Fifth Avenue-14th Street Corp., 2 T.C. 516. Did the obligation of the 7% mortgage bonds of the old company become the obligation of the taxpayer in the 1935 reorganization? The amended reorganization plan provided: The holders of the present First and General Mortgage 7% Sinking Fund Gold Bonds will receive for each $1000 principal amount of said bonds, the following securities: (a) $1000 face amount of Timber License Certificates; (b) $250 par value of 3%-6% Cumulative Convertible Preferred Stock of the Company, subject to adjustment in cash or scrip, as the Court may determine, in respect of fractions of a share. Holders of bonds of smaller denominations shall receive new securities *239 in the same proportion. 8,032.5 shares of the convertible preferred shares of taxpayer were issued to the holders of the 7% bonds in payment of the unpaid interest of $80,325 on their bonds. No question has been raised as to this interest or the shares issued for it. "Timber License Certificates" and "Certificates of Beneficial Interest" were terms applied in the amended reorganization plan to the certificates to be issued by the trustee to whom the "Company" was required to convey "all of its right, title and interest in any Canadian timber licenses and Canadian freehold lands * * *, together with all the rights and privileges of the Company in connection therewith, and all contracts for the sale or other disposition of wood, stumpage or timber therefrom," and "321,300 par value of the 3%-6% Cumulative Non-Convertible Preferred Stock of the Company." All receipts from timber and timber licenses, all dividends on the preferred shares, and all money received by the trustee from any source for the benefit of the holders of "Timber License Certificates" were to be used by the trustee, first, to pay interest on such certificates and, second, to reduce the face amount of the certificates *240 by pro rata distribution among the holders thereof, except that the trustee could retain such funds as it deemed necessary for the protection of the property owned by it for the benefit of the certificate holders. In the reorganization trust agreement made by taxpayer and Henry G. Lodge, trustee, the so-called "Timber License Certificates" were designated as "Convertible Trustee's Certificates." The certificates were captioned "Central Paper Company, Incorporated, Convertible Trustee's Certificates" and in the body of the certificate the following statement appears: This Certificate is one of a duly authorized issue of Central Paper Company, Incorporated, Convertible Trustee's Certificates of like date and tenor (except as to distinguishing numbers and denominations) limited to the aggregate principal amount of Three Hundred Twenty-one Thousand Three Hundred Dollars ($321,300), and issued under and equally and ratably secured by, an indenture dated as of February 1, 1935, made by and between Central Paper Company, Incorporated, a Michigan corporation * * *, and the Trustee * * * Although the certificates state that "No obligation shall be asserted or be enforcible against the *241 Trustee or the Company, or either of them, to pay this Certificate or any interest accrued thereon," this provision must be read in the light of all the terms and provisions of the trust agreement and the reorganization plan. In the trust agreement itself it is provided: Aside from the covenants and agreements of the Company herein contained, neither the Trustee nor the Company, or either of them, shall be personally or individually liable for the payment of any principal of or interest on any of said Certificates, but the sole recourse of the Certificate holders shall be against the trust estate held as security for the Certificates and the proceeds and avails thereof, but subject always to the terms of this indenture. Although in terms the taxpayer was not obligated directly to the certificate holders, nevertheless the trustee representing the certificate holders would compel the taxpayer to comply with the covenants and agreements made by it in the trust agreement and as contemplated by the reorganization plan. The taxpayer did not, as in the case of the 6 1/2% first mortgage bonds of the old company, make the indebtedness a first lien on all its assets by the issuance of *242 first mortgage bonds; nevertheless it assumed, just as effectively, payment of the 7% bonds of the old company, plus interest from February 1, 1935. Pursuant to the trust agreement and reorganization plan, taxpayer conveyed the Canadian timber licenses and lands and equipment to the trustee and issued 32,130 of its non-convertible preferred shares of the par value of $10 a share to the trustee. In addition, it was required to pay to the trustee a prescribed percentage of its net profits each year during the existence of the trust beginning with the taxable year ended June 30, 1936. (Sinking Funds B and C.) It was stipulated that the amounts payable out of its annual net profits to the trustee were as follows: 1936
$ 7,350.83
1937
15,682.98
1938
4,811.44
1939
6,237.05
$34,082.30
These amounts were apparently paid under the provisions as to Sinking Fund B. The trust was liquidated in May, 1940, so that taxpayer was not required to make any further payments out of its net profits. Taxpayer also agreed to pay all fees and governmental charges on the Canadian timber licenses, maintenance and operation expenses of the Canadian property and also the expenses of *243 the trustee in the administration of the trust. By the trust agreement taxpayer assumed the indebtedness represented by the 7% bonds of the old company (i.e., principal of $321,300 and interest thereon after February 1, 1935) to the extent of the par of 32,130 of its non-convertible preferred, the value of the Canadian timber licenses and lands, etc., and the net profits required to be paid into the sinking funds for the redemption of certificates. Such shares, property and cash not only represented the extent of taxpayer's liability but constituted collateral security for the payment of the indebtedness. The preferred were entitled to preference over the common upon any liquidation at par and accrued accumulative dividends. They were redeemable at 105%. The balance sheet of taxpayer as of June 30, 1935, after offsetting the timber rights of $617,831.49 by depletion reserve in the same amount and after issuance of $716,725 par preferred (21,500 shares in payment of unpaid interest on 6 1/2% first mortgage bonds of old company, 32,130 shares to trustee, 8,032.5 shares in payment of unpaid interest on 7% bonds of old company, and 10,010 shares to unsecured creditors) shows a surplus *244 or undivided profits of $303,740.55. It may be inferred that the value of the preferred was at least $10 a share throughout the entire period from 1935 to 1940. Under the reorganization plan and the trust agreement, in the event of the loss or termination of the Canadian timber licenses, taxpayer was required to pay to the trustee $25,000 in five equal annual installments of $5,000 each. Thus the security underlying the trustee's certificates had a value at all times of at least $346,300 ($321,300 plus $25,000) not taking into consideration the percentage of taxpayer's net profits and the Canadian lands and equipment. Under the trust agreement taxpayer had the right to retire any of its preferred held by the trustee by delivering to the trustee certificates in an amount equal to the par value to be retired. It also had the right to deliver to the trustee certificates purchased in lieu of the payments required out of its net profits to provide a sinking fund for the payment of trustee's certificates. The certificates so delivered were to be cancelled. It also had the right on or before October 1, 1948, to pay the then principal amount of all outstanding certificates to the trustee *245 subject to the right of the holders of outstanding certificates to convert them into preferred. These rights were a method for the payment by the taxpayer of the indebtedness of $321,300 represented by the outstanding trustee's certificates after February 1, 1935. On taxpayer's first balance sheet as of February 6, 1935, appeared under liabilities "Mortgages (including bonds and notes so secured) $1,181,300.00." This represented the liability of the old company on its 6 1/2% mortgage bonds of $860,000 and on its 7% mortgage bonds of $321,300. From the balance sheet of June 30, 1935, it appears that taxpayer reduced its mortgage bond liability by $321,300 and in lieu thereof set up a "stock liability" of $321,300, which is the par value of the preferred transferred to the trustee for the benefit of the certificate holders. The holders of the 7% bonds of the old company exchanged their bonds for the trustee's certificates representing participation in the trust estate of the Canadian licenses and property and $321,300 par value preferred of taxpayer. The holders of the certificates had an option of conversion but they were not compelled to convert. If they did so they lost their *246 interest as certificate holders in the assets of the trust and became preferred shareholders of taxpayer. Taxpayer therefore did not issue its preferred to the trust in discharge of the indebtedness of $321,300 but as a pledge and a standing offer of settlement of the debt if the certificate holders converted their certificates into its preferred. Between April 6, and April 20, 1940, within the taxable year, holders of $12,700 principal amount of certificates converted their certificates into an equivalent amount of preferred. Thus, taxpayer in the taxable year discharged $12,700 of the indebtedness by the transfer to the certificate holders of its preferred. Such holders of certificates thus became shareholders of the taxpayer. As to this transaction no gain or loss resulted to the taxpayer. Prior to the taxable year taxpayer delivered to the trustee under the sinking fund provisions certificates of $43,000 which it had purchased for $27,782.75. The certificates were then cancelled. Hence, to the extent of $43,000 the indebtedness was discharged prior to the taxable year. Any gain resulting from the cancellation was taxable in the earlier years and not in the year ended June 30, 1940. *247 In the taxable year 1940 the taxpayer delivered to the trustee certificates of $215,200 which it had purchased at a cost of $172,670.02, a difference of $42,529.98. On April 20, 1940, the taxpayer paid $50,400 cash to the trustee to discharge the remaining certificates outstanding in that amount. Hence, in the year ended June 30, 1940, the taxpayer, on the surrender of certificates by it which it had purchased at less than face value, realized a gain of $42,529.98 instead of $49,982.56 as determined by the Commissioner. The Commissioner is not contending that taxpayer realized a gain on the exchange or conversion of certificates for preferred. He claims that a gain was realized "upon surrender of Trustee's Convertible Certificates for cancellation at an amount in excess of cost." When taxpayer delivered the certificates to the trustee, it had no conversion rights as had the original holders of the certificates. The trust agreement provides: In lieu of payment of cash for said Sinking Fund B, the Company shall have the right to make payments into said sinking fund in whole or in part by the delivery to the Trustee of any Certificates secured hereby, taken at their actual cost to *248 the Company. * * * Any Certificates delivered to the Trustee hereunder shall be cancelled. * * *
The Company may retire any of the Cumulative Preferred Stock of the Company held by the Trustee in the trust estate by delivering to the Trustee, Certificates in original principal amount equal to the par value of such Preferred Stock to be retired. Certificates delivered to the the Trustee by the Company pursuant to this section shall be cancelled and Preferred Stock surrendered to the Company by the Trustee pursuant hereto shall be retired and shall not be reissued. That taxpayer did not have any conversion rights is also shown by the fact that it purchased $49,300 par value of certificates at a cost of $34,020.75 which it delivered to the trustee on and prior to October 3, 1939, in lieu of cash payments into Sinking Fund B. Such certificates were cancelled but preferred were not delivered by the trustee to the taxpayer until the trust was liquidated in 1940. Then such preferred had to be and was retired by the taxpayer and could not be reissued in conversion of the certificates purchased by it. It could not convert the certificates into preferred and hold such shares as treasury *249 shares. Since the conversion privilege was not applicable to the taxpayer, its contention that the turning in of the certificates in exchange for its own preferred was a capital transaction must fall. However, part of the transaction was a capital transaction but that was not because of the turning in of certificates by the taxpayer but because holders of certificates of the par value of $12,700 exercised their right to convert their certificates into preferred. To that extent the certificates paid in represented the subscription price paid to taxpayer for the 1,270 preferred issued to such certificate holders. Terminal Investment Co., 2 T.C. 1004, cited by the taxpayer, is not applicable because the indebtedness here represented by the 7% mortgage bonds was not cancelled by the court in the 77B proceeding as was the interest indebtedness in the Terminal case. On the contrary, to assure payment of the $321,300 indebtedness to the certificate holders, taxpayer was required to and did convey to the trustee property upon which the 7% bonds were a first lien and $321,300 par value of its preferred and in addition agreed to set aside certain of its earnings. In the Terminal *250 case the scrip certificates evidencing noncumulative "contingent interest" payments were payable only out of future net earnings and only if the taxpayer had net earnings after payment of other substantial obligations, which excess net earnings the taxpayer never had. That is entirely different from the situation in the case at bar. The proposition of the taxpayer that, if the certificates were not contingent obligations no income would result from their acquisition because the acquisition would be a non-taxable gift, as held in Helvering v. American Dental Co., 318 U.S. 322, cannot be adopted. 2. The taxpayer now claims a deduction, which it failed to take on its return, for an alleged loss of $426,809.12 said to be the difference between the adjusted cost ($544,618.91) of the timber licenses acquired by the old company in 1923, and the value ($117,809.79) realized in the liquidation of the trust in 1940. This is computed by the taxpayer as follows: *89% of $570,000 allocated to timber licenses
$507,300.00
Adjustments
(1) Amount recovered in suit for damage to timber and depre-
ciable assets
$ 3,500.00
Attorney's fees and expenses were $2,227.88, making net
recovery $1,272.12
(2) Proceeds from sale of stumpage cut and sold
577.34
(3) Loss of $50,340 claimed and allowed in full in return of old
company for period ended 2/6/35 on cancellation of right
to cut other than pulpwood on Berths A-1 and A-2 and
A-2 and Green Berth
50,340.00
(4) Part of original cost applicable to pulpwood on Block A-1
damaged by fire in May, 1933
2,932.50
57,349.84
Adjusted basis of old company
$449,950.16
Plus: Amount paid into trust April 20, 1940
60,648.00
Cost of certificates
34,020.75
94,668.75
Total Cost Basis
$544,618.91
Received from Trust in liquidation
(a) Cash
4,841.20
(b) Contract receivable (Johnson contract)
10,948.59
(c) 9,970 shares non-convertible preferred at par
99,700.00
(d) 212 acres of Canadian freehold land
2,120.00
(e) Improvements on above land
200.00
(f) Timber rights under Johnson agreement of April 3, 1937
117,809.79
Loss
$426,809.12
*251 The taxpayer claims, as its own basis, the adjusted cost on the books of the old company on the ground that under Section 113(a)(7) it, as the reorganization successor, inherited the basis of the predecessor. This theory is disputed by the Commissioner, but it can be accepted for the moment arguendo without reaching a conclusion. Assuming that proposition, the questions are, what is the cost basis of the predecessor old company when it acquired the property in 1923; did the taxpayer retain the property or an interest in it until 1940; and, if so, did it sustain a loss in 1940 on the liquidation of the trust? The facts of each of these are necessary to a determination of the claimed deductible loss. Failure or inadequacy of evidence to sustain the affirmative of any one must result in a decision adverse to the taxpayer who relies upon them and has the burden of proof. The old company acquired the timber licenses in 1923 and, as the findings show, at that time it issued $586,610 par value of 7% preferred to the Manufacturer's Paper Company for them. On the old company's books this amount with some small adjustments was charged as Canadian *252 Timber Limits, and to this was added in 1924 an item of common stock $100,000. This accounting was thereafter shown on the balance sheets appended to the tax returns, so that among the book assets until the reorganization of 1935, there appeared as an asset an item of over $670,000 as Canadian Timber Rights. Other than this accounting on the books and balance sheets, there is nothing in the record to show the actual cost of the timber rights to the old company when they were acquired. Some evidence was introduced intended to show the value of the timber rights in 1923; but since the corporation at that time appears to have been already long in existence and actively engaged in business, with an existing outstanding common capital stock of more than a million dollars and a surplus of half a million, al representing substantial mixed assets, it could not be found as a fact that the cost of the timber rights was equal to the par value of the preferred shares said to have been issued for them, or that the actual value of the preferred is determined by the appraisal of the timber rights received. While it has been held that in a proper case the value of all its shares issued by a corporation *253 at organization for property may be taken to be the same as the value of the property for which such entire original issue was made, Ida I. McKinney, 32 B.T.A. 450, 456, MacCallum Gauge Co., 32 B.T.A. 544, 549, this cannot be applied as a formula for determining the value of some new shares issued long after its organization by a corporation having large properties and complicated accounts; for such new shares would merely take their place in the total capital structure inrespective of their par value, and the value of the property newly acquired would be absorbed in the total value of all the corporation's assets and would not reflect their cost. Pierce Oil Corp., 32 B.T.A. 403; Budd International Corp., 45 B.T.A. 737, 748, 143 Fed. (2d) 784, 792, 794. Thus, it must be held that the cost of the timber rights to the old company, if it were determinative of the taxpayer's basis for loss, cannot be found from the evidence even if the book accounts were regarded as proving the facts which they purport to record. Cf. Doyle v. Mitchell Brothers Co., 247 U.S. 179. Assuming, however, that the evidence establishes the cost *254 of the timber rights to the old company in 1923, the next question would be whether in fact the taxpayer acquired the timber rights in the 77B transfer in 1935. The old company is said by taxpayer in its brief, and it so appears in the reorganization plan, to have issued $321,300 sinking fund 7% bonds secured by these timber rights and that the remaining equity in the timber rights at the time of the transfer to the taxpayer in 1935 was $48,325.16. This, in substance, would be what the taxpayer acquired from the old company in 1935, and this is what the taxpayer in its brief seems to say it acquired as its interest in Canadian Timber Property. It may, however, be taken that the old company transferred to the taxpayer all the timber rights it had. It is said by taxpayer on brief that under the reorganization plan it acted as a mere conduit for the Canadian timber property, that it never acquired or held any interest in such property except its interest in the trust, that the $321,300 first and general mortgage 7% sinking fund bonds and unpaid interest $80,325 were a first lien on such property, and that the "net figure for such Canadian Timber Property was therefore $48,325.16." This *255 apparently was the reason for the transfer of the property to the trustee for the benefit of the certificate holders, the former holders of the 7% bonds of the old company. Thus the taxpayer acquired, not the Canadian timber property itself, but an interest in the trust, as it says, for under the reorganization plan and trust indenture the taxpayer was entitled only to the property, if any, remaining in the trust estate after the claims of the certificate holders had been satisfied. Although taxpayer says that it only acquired an interest in the trust, the net figure for which was $48,325.16, it claims that the old company's adjusted basis for the Canadian timber licenses, computed by it to be $449,950.16, became its basis for "its interest in the Trust" which acquired the Canadian timber property. Under the statutory scheme if a reorganization falls within the non-recognition provisions, no gain or loss is recognizable to the transferor, and the transferee, in computing gain or loss upon a subsequent disposition of the property uses the transferor's basis. This taxpayer acquired an interest in a trust set up for the benefit of secured creditors of the old company. At no time was *256 its interest greater than the remainder of the trust estate after satisfaction of the claims of the certificate holders. At no time could it have demanded the trust property unless it paid the claims of the certificate holders. As to these certificate holders, the reorganization plan was not consummated until 1940 when the trust was liquidated, and it was not until then that the taxpayer's interest in the trust estate was definitely established and it became entitled to receive its interest, i.e., the remainder of the trust estate after the satisfaction of the claims of the certificate holders. The liquidation of the trust was not a disposition by the taxpayer as a transferee of property and there is no occasion entitling it to use the cost basis of the transferor. The trustee was the representative of the certificate holders, and upon the liquidation of the trust he transferred to taxpayer the interest or property which it was to receive from the transferor under the reorganization plan. The taxpayer did not dispose of its interest in the trust during the trust's existence and it did not dispose in the year 1940 of the assets it received from the trustee. Passing to the next step, *257 it appears that in the reorganization and after the taxpayer had in 1935 received the old company's assets it transferred the timber rights to the trustee with an obligation to pay to the trustee $25,000 if for any reason it should be unable to or should fail to transfer the timber rights. This amount was apparently regarded as a measure of indemnity or compensation in lieu of the timber rights, and therefore is some measure of the value of the timber rights at the time of the reorganization in 1935. Thereafter the trustee in 1937 sold in an arm's length transaction such timber rights as it had to Johnson for $50,000, and some cutting rights to be conveyed. If there was a loss in respect of the timber rights, it would seem that such loss occurred in 1937 when the rights were sold and that a resulting deduction therefor was available at that time and not held in suspense until the liquidation of the trust in 1940. Cf. Hans Pederson, 14 B.T.A. 1089, 1117-1118. It must be decided that even if the taxpayer was a reorganization transferee, within the meaning of Section 112, the evidence does not warrant a finding that it sustained a loss in 1940 or a holding that a deduction *258 may be taken in that year. However, it should be added that the evidence does not establish that the taxpayer, as a reorganization successor of the old company, has established the conditions laid down by Section 113(a)(7). The condition of that section is that after the reorganization transfer to the new or successor corporation an interest or control in the property transferred of 50% or more should remain in the same persons. The taxpayer says that this section is met because the shareholders of the old company acquired 58% of the voting control of the new corporation, - the taxpayer. The evidence, however, does not support this. Although it appears that the taxpayer, in the reorganization plan, issued 7,014 common shares for old company's common, 60,000 common shares for old company's 7% preferred and 33,750 common shares for old company's 8% preferred, and that the sum of these, 100,764, was 58% of the entire number of shares issued by the new corporation, 172,436 - 1/2, it cannot be found as a fact from anything in the record that an interest or control in 50% or more of the corporate property remained in the same persons who controlled the property of the old company. Even if *259 it be assumed that the 7% preferred of the old company was voting stock, and that naturally the common shares were voting stock, nothing indicates that the 8% preferred of the old company was voting stock. These shares were not included in the increase in capital stock of 1923, and the record shows nothing about their terms, particularly whether or not they had voting rights, as the earlier 7% preferred originally had. Thus it is only shown that the voting rights of the new corporation were in less than 40% of the persons who were shareholders of the old company. The taxpayer, therefore, has failed to show that by meeting the conditions of Section 113(a)(7) it is entitled to the use of the old company's basis for determining gain or loss on the disposition of the timber rights or on the liquidation of the trust in so far as it involves the old company's basis for the timber rights. The Commissioner is entitled to a decision in the amount of deficiency, (less than the amount determined) resulting from including in the taxpayer's 1940 income the gain of $42,529.98 derived from the acquisition of the certificates. The taxpayer is not entitled to any deduction for loss in respect of *260 the timber rights acquired by the old company in 1923. Decision will be entered under Rule 50. Footnotes
*. The Common Capital Stock account on the books of the old company shows common shares outstanding, $1,503,050. It is stated in the approved plan of reorganization that as of January 28, 1935, the old company had outstanding 150,305 shares of no par common.↩
*. The item "Construction in Process" represents the cost of new machinery and of work done to increase the production of pulp and paper from 50 tons a day to 100 tons.↩
*. The 89% allocation is stipulated.↩