*Decision will be entered under Rule 50.*

MacCallum Gauge Company, Petitioner, *v*. Commissioner of Internal Revenue, Respondent.

Docket No. 70437.   Promulgated April 30, 1935.

*Stanley S. Waite, Esq.*, for the petitioner.
*T. M. Mather, Esq.*, for the respondent.

### OPINION.

McMahon: This is a proceeding for the redetermination of a deficiency in income tax for the calendar year 1930 in the amount of $485.48. It is alleged that the respondent erred in determining that

the basis for the exhaustion or depreciation of a patent secured by James MacCallum, Jr., on a liquid measuring device and assigned by him to petitioner on April 30, 1930, was the cost thereof to the assignor, instead of determining that the proper basis is the value of the patent on the date when it was assigned to the petitioner, which value, it is alleged, was $119,587.58.

The petitioner is a corporation, with principal office in St. Louis, Missouri.

The parties entered into a stipulation of facts, which we incorporate herein by reference, setting forth, however, only such portions as are necessary to an understanding of the proceeding. The stipulation discloses that James MacCallum, Jr., perfected a liquid measuring device; that he agreed to pay E. R. Powell, who assisted him, one third of all the amount received in the event of the sale of the invention, and one third of all royalties received, and withheld from Powell any other interest in any patents or application for patents therein; that thereafter MacCallum agreed to pay O. F. McKnight, in consideration of his promotion of the invention, certain stock of a proposed company to be incorporated, to which company the rights to manufacture the said measuring device were to be conveyed, and one sixth of the net royalties received; that thereafter the Gaso-Scope Corporation of America was organized, to which MacCallum, in exchange for stock, transferred the rights to manufacture the measuring device for which application for letters patent had been made; that in the agreement between MacCallum and the Gaso-Scope Corporation of America, dated October 12, 1922, it was provided that in case the Gaso-Scope Corporation of America should become insolvent or be adjudged a bankrupt, then all rights conferred should revert to MacCallum; that MacCallum then transferred some of the stock to others; that on February 20, 1923, MacCallum, Paul J. Bierman, and the Gaso-Scope Corporation of America entered into an agreement under which Bierman agreed to invest $25,000 in the corporation in exchange for 2,500 shares of preferred stock and 36,550 shares of the common stock; that the contract of February 20, 1923, also provided for the organization of a new Missouri corporation, the stock thereafter to be distributed on the same basis as the common stock of the Gaso-Scope Corporation of America was then held or to be held, and that MacCallum should transfer the invention to the new Missouri corporation; that in the meantime Bierman had secured an option to purchase from Powell whatever interest he had in an undivided one-third interest in 60,000 shares of the common stock of Gaso-Scope Corporation of America issued in the name of MacCallum, the consideration being $5,000; that Bierman failed to fulfill his part of the contract of February 20, 1923, became dissatis-

fied, and was instrumental in involving the Gaso-Scope Corporation of America in receivership proceedings, and then in bankruptcy; that subsequently the Gaso-Scope Corporation of America was adjudicated a bankrupt and thereby lost its right to manufacture the measuring device; that during 1925 MacCallum entered into an agreement with the King-Seeley Corporation under which he granted that corporation the exclusive right to manufacture the measuring device in consideration of the payment to him of royalties; that on June 12, 1928, patent No. 1673753 was issued to James MacCallum, Jr., by the United States covering this measuring device; that sometime in 1929 or 1930 Bierman caused to be organized the Gage-Rite Corporation; and that such corporation and Bierman instituted suit against MacCallum and the King-Seeley Corporation to compel the transfer of patents or applications therefor to the Gage-Rite Corporation in pursuance of the agreement of February 20, 1923, and for an accounting of the amount of money paid by the King-Seeley Corporation to MacCallum under the license agreement. The stipulation then states as follows:

15. In order to settle all litigation between the parties, and prevent the loss of other patents perfecting said measuring device, for which applications were pending, by failure to prove said patents before the Patent Office due to the tying up of the money by impounding under court order, Bierman and MacCallum entered into a contract in 1930 under which they agreed to organize a new corporation to be named the MacCallum Gauge Company, and MacCallum agreed to transfer his patent to said company, said company to have a capital of 1,200 shares of stock, 840 shares of which were to be issued to MacCallum and 360 shares to Bierman. The agreement provided for the payment of $5,000.00 from MacCallum to Bierman to reimburse Bierman for the money he paid to Powell for his stock in the Gaso-Scope Corporation of America. Said agreement also provided that the outstanding license agreement between MacCallum and King-Seeley Corporation, covering the domestic manufacture of said measuring devices under said patent, should be issued to said new corporation, contemporaneously with the execution of said agreement.

16. In pursuance to [sic] said agreement, the MacCallum Gauge Company was organized April 28, 1930, under the laws of the State of Missouri, with a capital stock of 1,200 shares and 840 shares of the stock of said corporation were issued to MacCallum, and 360 shares were issued to Bierman. On April 30, 1930, MacCallum assigned to said company the patent for said measuring device and the license agreement existing between him and the King-Seeley Corporation.

17. On April 30, 1930, when said patent was transferred to the MacCallum Gauge Company, its fair market value was $100,000.00. The cost of said patent to MacCallum is $18,780.56.

18. It is petitioner's contention that the basis for the annual deduction for exhaustion of said patent is $100,000.00, the value thereof when transferred to petitioner, which contention is denied by respondent. Respondent's contention is that said basis is the cost of said patent to MacCallum and the cost, $18,780.56, has been allowed by respondent as the basis for the annual deduction for exhaustion of said patent.

The question presented for determination is whether the basis, in the hands of the petitioner, for the determination of the exhaustion allowance upon the patent transferred to the petitioner on April 30, 1930, is the value of the patent at the date of such transfer to the petitioner, $100,000, as contended by the petitioner, or the cost of the patent to MacCallum, $18,780.56, as held by the respondent.

Section 114 (a) of the Revenue Act of 1928 provides that the basis upon which exhaustion is to be allowed in respect of any property shall be the same as is provided in section 113 for the purpose of determining the gain or loss upon the sale or other disposition of such property. Section 113 provides that the basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property, with certain exceptions. One of such exceptions is contained in subdivision (8) of section 113 (a). Such subdivision provides that if the property was acquired after December 31, 1920, by a corporation by the issuance of its stock or securities in connection with a transaction described in section 112 (b) (5), then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. Section 112 (b) (5), referred to in section 113 (a) (8), provides that no gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation, but in the case of an exchange of property by two or more persons this provision shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. Section 112 (j) provides that the term " control " means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

The respondent contends that the patent and the license agreement between MacCallum and the King-Seeley Corporation were transferred to the petitioner by MacCallum and Bierman, that the stock and securities received by each were substantially in proportion to his interest in the property prior to the exchange, and that, therefore, the basis for exhaustion allowance is the cost thereof to MacCallum in the amount of $18,780.50. Petitioner, on the other hand, contends that MacCallum was the sole owner of the patent, that he alone transferred it to the petitioner, and that since immediately after the exchange MacCallum was not in control of the peti-

tioner, there is no exception to the general provision that the basis is cost to the petitioner.

We agree with petitioner that MacCallum was the sole owner of the patent. The stipulated facts show that MacCallum, by agreement entered into February 20, 1923, agreed to transfer his interest in the patent to a new Missouri corporation to be organized, but that this contract was never performed. Even if this had been done it would not have been tantamount to transferring an interest therein to Bierman, who was to be a stockholder of the new corporation. So far as we can determine from the stipulated facts MacCallum did not, at any time prior to April 30, 1930, ever transfer any right, title, or interest in his invention, patent application, or patent to Bierman or anyone else, with the exception that by the license agreement in 1925 he granted the King-Seeley Corporation the right to manufacture the device. The suit instituted by Bierman against MacCallum did not result in any decision of the court that anyone other than MacCallum owned an interest in the patent, but was settled out of court. The stipulated facts relative to the agreement of settlement entered into between Bierman and MacCallum in 1930 do not disclose that Bierman was thereby given any interest in the patent, as contended by the respondent. Such stipulated facts show that this settlement agreement was entered into for the purpose of putting an end to the litigation and preventing the loss of other patents perfecting the measuring device for which applications were pending, by failure to prove such patent before the Patent Office due to the tying up of the money by impounding under court order As the evidence shows, $5,000 was paid by MacCallum to Bierman to reimburse Bierman for the money he paid Powell for stock in the Gaso-Scope Corporation. This is the only consideration that passed from MacCallum to Bierman. No patent rights passed from Mac-Callum to Bierman. That MacCallum was the sole owner of the patent and that it was he alone who transferred it to the petitioner is shown by the stipulated facts as follows:

\* \* \* MacCallum agreed to transfer his patent to said company [the petitioner] \* \* \*. Said agreement also provided that the outstanding license agreement between MacCallum and King-Seeley Corporation, covering the domestic manufacture of said measuring device under said patent, should be issued to said corporation, contemporaneously with the execution of said agreement.

\* \* \* On April 30, 1930, MacCallum assigned to said company [the petitioner] the patent for said measuring device and the license agreement existing between him and the King-Seeley Corporation.

To find or hold that MacCallum was not the sole owner of the patent would be contrary to the stipulations of the parties, and would be in violation of them.

The stipulated facts show that MacCallum received 840 shares of the petitioner's capital stock and that Bierman received 360 shares of such stock at that time. The facts upon this point are stipulated in the following words: "In pursuance to [*sic*] said agreement the MacCallum Gauge Company was organized April 28, 1930, * * * and 840 shares of the stock of said corporation were issued to Mac-Callum, and 360 shares were issued to Bierman."

It will be seen that immediately after the transfer of the patent and the license agreement by MacCallum to the petitioner, Mac-Callum was not in control of the petitioner, owning only 70 percent of the petitioner's stock, whereas "control" under the statute requires a holding of 80 percent of the stock. This proceeding comes within no exception to the general provision and the basis for exhaustion of this patent in the hands of the petitioner is its cost to the petitioner.

The fair market value of the stock issued by a corporation for a patent or other property is the measure of the cost of the patent or other property to the corporation. *Fifth Street Building*, 24 B. T. A. 876; *Hazeltine Corporation*, 32 B. T. A. 4; *Ida I. McKinney*, 32 B. T. A. 450; *Pierce Oil Corporation*, 32 B. T. A. 403, and cases cited therein. The net result of the transaction was that petitioner transferred 840 shares of its capital stock to MacCallum, receiving therefor the patent and all of MacCallum's rights under the license agreement between him and the King-Seeley Corporation. It is our opinion that the rights under the license agreement should be considered as inhering in the patent. The parties have stipulated that the fair market value of the patent on April 30, 1930, the time it was transferred to the petitioner, was $100,000. The only thing shown to have been paid in to the petitioner was this patent valued at $100,000. So far as the record shows, the patent and the rights that inhered in it constituted all of the assets of petitioner immediately after the transfer thereof and the issuance of its 1,200 shares of stock. In such a situation as is presented here, where there is no other method of measuring the fair market value of the stock of a corporation, the fair market value of the stock may be measured by the fair market value of the assets. *Ida I. McKinney, supra;* and *Fifth Street Building, supra.* In the former case, we stated in part:

It is well settled that the cost to a corporation of the property acquired through the issuance of its capital stock is the fair market value of such capital stock on the date issued, and where all of the capital stock of a corporation is issued for property and there is no other method of measuring the fair market value of the stock so issued, such fair market value on that date may properly be determined to be the equivalent of the fair market value of the property received. *Reliance Investment Co.*, 22 B. T. A. 1287; *Mead Realty Co.*, 21 B. T. A. 1062; *L. H. Philo Corporation*, 16 B. T. A. 130; *John*

*Glackner Realty Corporation*, 11 B. T. A. 151; *Realty Sales Co.*, 10 B. T. A. 1217.

In the latter case we stated in part:

\* \* \* the cost as determined from the fair market value of the property acquired for its stock may be used as a basis for computing deductions for exhaustion over the term thereof for the years 1921 and 1923. *Ben T. Wright, Inc.*, 12 B. T. A. 1149.

It is true that, in the two cases just cited and quoted from, all or substantially all the stock of the corporation involved was issued for one particular asset, and, as pointed out in *Pierce Oil Co.*, *supra*, if all the outstanding shares of a corporation are not issued for a particular asset the value of such asset is not to be taken as the cost thereof to the corporation. However, the fair market value of the asset may properly be taken as the measure of the fair market value of *all* of the outstanding stock of the corporation under such circumstances as are present here. The value of all of petitioner's outstanding shares is reflected by the value of the patent. Here the 1,200 shares of stock of the petitioner had a fair market value of $100,000, which is the stipulated value of the patent. As pointed out above 840 of the 1,200 outstanding shares were issued to MacCallum for the patent. These 840 shares had a fair market value of 840/1200 of $100,000 or $70,000. The cost of the patent to the petitioner was, therefore, $70,000; and upon the recomputation the petitioner may take, as a deduction, an allowance for exhaustion thereof based upon such cost. The exhaustion of a patent is computed upon a life for the patent of 17 years from the date of its issuance. *Hazeltine Corporation*, *supra*. The patent was acquired by the petitioner on April 30, 1930, and for the remainder of such calendar year the petitioner is entitled to deduct as exhaustion an aliquot part of $70,000, the cost of such patent to the petitioner, based upon the remaining life of the patent in the hands of the petitioner of 15 years, 1 month and 12 days.

Reviewed by the Board.

*Decision will be entered under Rule 50.*