*Decisions will be entered under Rule 50.*

PITTSBURGH TERMINAL CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 562-71. Filed April 23, 1973.

Monroe Guttmann (an officer), for the petitioner.
*Louis A. Boxleitner*, for the respondent.

IRWIN, *Judge:* Respondent determined a deficiency of $58,655.37 in the income tax of petitioner for 1966. The ultimate question to be decided is whether petitioner had any allowable capital loss from sale of coal lands in 1966; however, the decision on this question depends upon the resolution of the following issues:

(1) Whether the cost basis of coal lands acquired by Terminal Railroad & Coal Co. (Terminal Coal No. I) exceeded the deductions for depletion, allowed and allowable, taken by Terminal Coal No. I and its successors from 1902 until 1966;

(2) Whether the bankruptcy reorganization in which petitioner acquired the coal lands from the successor of Terminal Coal No. I constituted a reorganization under section 112(b)(10), I.R.C. 1939, which would entitle petitioner to use a carryover basis for such lands;

(3) Whether the transaction in which petitioner disposed of the coal lands in 1966 was a sham which should be disregarded for tax purposes. Petitioner must prevail on each of these issues in order to prevail on the ultimate question of whether a capital loss is allowable in 1966.

FINDINGS OF FACT

*General Facts*

Some of the facts have been stipulated. We incorporate the stipulations and the exhibits attached thereto by this reference.

Petitioner is the Pittsburgh Terminal Corp. which has had its principal place of business at all relevant times in Castle Shannon, Pa. Prior to December 1955 petitioner's name was Pittsburgh Terminal Realization Corp.

Petitioner was incorporated in Pennsylvania in December 1944 as part of a plan of reorganization in a chapter X proceeding in the U.S. District Court, docket No. 20716 in bankruptcy, to receive and liquidate the remaining assets of Pittsburgh Terminal Coal Corp. (Terminal Coal No. II), the debtor in that proceeding.

Terminal Coal No. II was formed on December 1, 1924, as the corporation resulting from the merger of Meadow Lands Coal Co. and Pittsburgh Terminal Coal Co. (Terminal Coal No. I).

Terminal Coal No. I was incorporated on April 28, 1902, in Pennsylvania with initial capital of $1,000 consisting of 10 shares of $100 par value common stock. From its inception until 1922, Terminal Coal No. I used the name Pittsburgh Terminal Railroad & Coal Co. The record does not disclose who the original shareholders of Terminal Coal No. I were, but as of June 25, 1902, J. G. Patterson and W. K. McMullin were its president and secretary, respectively.

On June 24, 1902, the authorized capital stock of Terminal Coal No. I was increased to 140,000 shares of $100 par value common stock, and its authorized indebtedness was increased to $7 million to be represented by 7,000 first mortgage, 5-percent, 40-year sinking fund bonds in the face amount of $1,000 each.

The newly authorized stock and part of the bonds were used by Terminal Coal No. I to purchase on July 1, 1902, approximately 10,600 acres of coal lands located in Allegheny County, Pa. At the time of the purchase there were no mines operating upon these coal lands; however, between 1902 and 1920 eight coal mines were opened upon these lands.

Between 1902 and 1966 Terminal Coal No. I, Terminal Coal No. II, and petitioner disposed of various interests in the 10,600 acres of Allegheny County coal lands. On December 20, 1966, petitioner executed a deed transferring its remaining interest in the Allegheny County coal lands to South Hills Terminal Co. (South Hills). As consideration for this transfer South Hills agreed to pay petitioner $5,000 with terms of $1,000 down and four yearly payments of $1,000 beginning on December 20, 1970.

The stock of South Hills was owned by Janet S. Gilfillan, petitioner's secretary and bookkeeper, and her husband. The primary purpose for petitioner's transfer of the coal lands to South Hills was to obtain a capital loss to offset a substantial capital gain realized by petitioner in 1966 on the sale of other property.

On September 30, 1968, petitioner's president and principal shareholder, Monroe Guttmann (Monroe), purchased the stock of South Hills from Janet S. Gilfillan and her husband for $34,000, $10,000 down and $24,000 payable in installments over a 20-year term. Shortly after purchasing the South Hills stock Monroe liquidated the corporation and sold the coal lands to an unrelated party for $40,000 in cash. This sale had been arranged by Monroe prior to his purchase of the South Hills stock.

In its original return for 1966 petitioner claimed that it realized a long-term capital loss of $573,526.85 on the sale of the Allegheny County coal lands to South Hills. In an amended return petitioner claimed that the amount of the loss realized was $1,202,709.39, and in its petition to this Court petitioner stated that the loss was $1,887,-853.58. In any event petitioner claims that its basis for the coal lands transferred to South Hills is traceable to the July 1, 1902, purchase of coal lands by Terminal Coal No. I.

*Facts re Issue 1. Cost of Coal Lands in 1902*

On June 25, 1902, Terminal Coal No. I entered into an agreement with Charles Donnelly (Donnelly), Frank F. Nicola (Nicola), and Frank M. Osborne (Osborne). The agreement provided that:

(a) Donnelly, Nicola, and Osborne would transfer certain coal and surface lands to Terminal Coal No. I as well as all the stock of West Side Belt Railroad Co. (West Side Railroad) and of Belt Line Railway Co. (Belt Line Railway). Only 10 percent of the subscription price of Belt Line Railway had been paid at that time.

(b) Donnelly, Nicola, and Osborne would pay $350,000 in cash to Terminal Coal No. I.

(c) In consideration of the coal lands, railroad stock and cash to be transferred to it, Terminal Coal No. I would deliver to Donnelly, Nicola, and Osborne:

(i) 139,990 shares of its $100 par value capital stock; and

(ii) approximately 5,500 of its first mortgage bonds, the precise number to be adjusted as hereinafter stated.

According to the June 25, 1902, agreement, the bonds to be delivered to Donnelly, Nicola, and Osborne by Terminal Coal No. I were to be determined as follows:

(a) From the $5,500,000 face amount of such bonds, $1 million in

bonds (1,000 bonds) was to be deducted and delivered to Colonial Trust Co. for the purpose of its redeeming and retiring the $1 million first mortgage bond issue of West Side Railroad then outstanding; such $1 million in bonds was in fact deducted and delivered to Colonial Trust Co.

(b) From the $5,500,000 face amount of such bonds, a further portion thereof would be retained by Terminal Coal No. I to reimburse it for the value of any coal lands which Donnelly, Nicola, and Osborne failed to convey or to deliver satisfactory title to Terminal Coal No. I.

The first mortgage of Terminal Coal No. I, guaranteed by West Side Railroad, was executed by Donnelly as president of Terminal Coal No. I.

On July 1, 1902, West Side Railroad also executed a mortgage to Colonial Trust Co. securing its guarantee of the first mortgage bonds of Terminal Coal No. I. Donnelly also executed this mortgage in his capacity as vice president of West Side Railroad.

The total amount of bonds issued by Terminal Coal No. I did not exceed $4,310,000.

On July 1, 1902, Donnelly and Nicola executed a deed to Terminal Coal No. I conveying 187 tracts of coal lands in Allegheny County. These tracts totaled about 10,600 acres of undeveloped and unmined coal in place.

Donnelly was the president and a director of Terminal Coal No. I at the time he and Nicola conveyed these 187 tracts of coal lands to it. Nicola was also a director of that corporation at that time.

The West Side Railroad was about 3 miles long in 1902. The Belt Line Railway was only a paper corporation which never conducted any business.

The term "coal in place," as used in this proceeding, does not include surface lands or coal which has been mined.

By their deed of July 1, 1902, Donnelly and Nicola also conveyed to Terminal Coal No. I their title and interest in 38 acres of surface land in Allegheny County.

The coal lands purchased by Terminal Coal No. I were completely undeveloped. There had been virtually no geological exploration of the coal lands prior to the purchase to determine the nature and extent of the coal in place; however, it was generally known that the Pittsburgh seam of coal ran uniformly throughout Allegheny County in a 5-foot vein. A 5-foot seam of coal could be mined in an economical fashion; however, such a seam was considered thin and not as desirable as a seam of 6 feet or more. The 10,600 acres of coal lands had relatively few outcrop areas—places where the seam of coal was exposed on the surface. In the absence of outcrop areas coal had to be mined through

deep-mining methods which required the digging of a vertical shaft to reach the coal. Outcrop coal can be mined through drift-mining methods in which a shaft is dug in a hillside. Generally, deep mining is more costly than drift mining because it is more difficult to provide drainage for a deep mine and to remove the coal from a deep mine than it is for a drift mine.

The 187 tracts of coal lands in place in Allegheny County conveyed by Donnelly and Nicola to Terminal Coal No. I had been purchased by them from five individuals at a total cost of $3,444,519.32 in cash on or shortly prior to the date of their conveyance of the said 187 tracts to Terminal Coal No. I. The persons from whom Donnelly and Nicola purchased each of said tracts, the cash consideration paid by them to each of these transferors, and the coal acreage acquired from each of them were as follows:

| Tracts | Person from whom Donnelly and Nicola made purchase | Cash consideration paid by Donnelly and Nicola for coal purchased | Number of acres in each purchase | Average price paid per acre |
|---|---|---|---|---|
| 1 to 16 (16 tracts) | James C. Boyer | $211,478.17 | 978 | $216.23 |
| 17 to 63 (47 tracts) | James B. Corey | [1] 664,291.00 | 1,898 | 350.00 |
| 64 to 104 and 187 (42 tracts) | John V. LeMoyne | 475,398.40 | 2,377 | 183.18 |
| 105 to 184 (80 tracts) | John S. Scully | 1,979,247.25 | 5,030 | 393.49 |
| 185 (1 tract) | do | 36,083.50 | 90 | 400.93 |
| 186 (1 tract) | James Linehart, et al | 78,021.00 | 260 | 300.00 |
| Total | | 3,444,519.32 | 10,633 | |

[1] Includes 7 acres of surface land.

The deed from Corey to Donnelly and Nicola also conveyed 7 acres of surface land in Allegheny County. The average price per acre for the 1,898 acres of coal lands plus 7 acres of surface from Corey was $340.87.

Boyer, Corey, Scully, LeMoyne, and Linehart were each paid in cash by Donnelly and Nicola for the coal in place which they respectively transferred and each of these transferors specifically acknowledged in his deed his receipt of the cash consideration recited in his deed.

Boyer had acquired the coal lands conveyed by him to Donnelly and Nicola in 1902 at various dates in 1900, 1901, and 1902 in 16 separate transactions at a total cost to him of $130,821.16. Boyer had a profit of $80,657 on his sale to Donnelly and Nicola.

Corey had acquired the coal lands conveyed by him to Connelly and Nicola in 1902 at various dates in 1900, 1901, and 1902 in 47 separate transactions at a total cost to him of $306,169.34. Corey had a profit of $358,122 on his sale to Donnelly and Nicola.

LeMoyne had acquired the coal lands (tracts 64–104 and 187) conveyed by him to Donnelly and Nicola in 1902 at various dates in 1894 through 1900 in 42 separate transactions at a total cost to him of $92,-

470.03. LeMoyne had a profit of $382,928 on his sale to Donnelly and Nicola.

Scully had acquired the coal lands (tracts 105–184) conveyed by him to Donnelly and Nicola in 1902 at various dates in 1889 through 1901 in 80 separate transactions at a total cost to him of approximately $770,000. Tract 185 had been acquired by Scully in 1902 at a cost of $36,083.50. Scully had a profit of $1,209,247 on his sale to Donnelly and Nicola.

On July 1, 1902, Terminal Coal No. I purchased 3,059 acres of Pittsburgh seam coal in Washington County from James V. Morris for $229,429.42 in cash and the assumption of mortgages totaling $116,-829.02, or a total cost of $346,258.44. The average price per acre paid in this transaction was $113. Morris had acquired this coal land in 1901 and 1902 at a total cost of $232,642.51, $115,813.49 in cash plus the assumption of mortgages totaling $116,829.02.

In July 1902 Terminal Coal No. I acquired four tracts of Pittsburgh seam coal lands in Washington County from one Charles W. Taylor for the following consideration:

| Acres acquired | Cash paid | Mortgages assumed | Total consideration | Cost to Taylor of coal transferred |
|---|---|---|---|---|
| 155.00 | $10,075.00 | $6,200.00 | $16,275.00 | $9,300.00 |
| 145.157 | 9,435.20 | 5,806.28 | 55,241.48 | 8,709.42 |
| 113.406 | 7,371.13 | 4,536.08 | 11,907.21 | 6,804.12 |
| 128 acres and 65 perches (128.406 acres) | 8,021.40 | 4,936.24 | 12,957.64 | 7,404.36 |
| 541.965 | | | 56,381.33 | 32,217.90 |

The average price per acre paid to Taylor was $104.

In August 1902 Terminal Coal No. I acquired 5 acres of Pittsburgh seam coal lands in Washington County, which adjoined Allegheny County, for $300 or $60 per acre.

In April 1903 Terminal Coal No. I acquired 277.38 acres of Pittsburgh seam coal lands in Washington County for $31,013.23 at an average cost of $112 per acre.

The 10,600 acres of coal lands which Donnelly and Nicola acquired from Boyer, Corey, LeMoyne, Scully, and Linehart and sold to Terminal Coal No. I were all contiguous or nearly contiguous. In some of the tracts Terminal Coal No. I only acquired the right to mine the Pittsburgh seam of coal; however, in 1902 the Pittsburgh seam was the only seam which could be mined. In some instances the tracts which had been acquired individually either by Boyer, Corey, LeMoyne, Scully, or Linehart formed large contiguous areas; however, in other cases such tracts either were isolated or formed small contiguous

areas. A fairly large contiguous area is necessary for the most efficient coal mine although an area of a few hundred acres can make a viable coal mine.

During the period from 1901 to 1903 coal lands were purchased by Terminal Coal No. I and other coal companies in the general vicinity of the subject 10,600 acres of Allegheny County coal lands for prices which did not exceed $200 per acre. Some of these tracts adjoined the subject acreage, and none were more than 15 miles from it. Although none of the purchases involved tracts as large as 10,600 acres, transactions involving 1,000 to 2,000 acres were common.

In 1902 a coal mine had to be located near either water or rail transportation to be economically viable. The 10,600 acres purchased by Terminal Coal No. I were not near to any water transportation or to any existing railway except the West Side Railroad which was owned by Terminal Coal No. I and which was still under construction. In 1902 there was a general shortage of railroad cars suitable for transporting coal.

In 1902 there was a strong demand for coal in the Pittsburgh area because of a strike in the anthracite coal fields in eastern Pennsylvania.

From 1902 to 1917 Terminal Coal No. I mined the following tonnages of coal from mines 1 through 7 located on its Allegheny County coal lands:

| Year | Tons mined | Year | Tons mined |
|------|-----------|------|-----------|
| 1902 | | 1913 | 2, 447, 452 |
| 1903 | 578, 032 | 1914 | 2, 394, 576 |
| 1904 | 1, 332, 500 | 1915 | 2, 125, 945 |
| 1905 | 1, 063, 644 | 1916 | 2, 799, 159 |
| 1906 | 1, 539, 347 | | |
| 1907 | 1, 451, 875 | Total 1913–16 | 9, 767, 132 |
| 1908 | 877, 615 | 1917 | 3, 038, 760 |
| 1909 | 716, 940 | | |
| 1910 | 1, 695, 104 | | |
| 1911 | 1, 576, 346 | | |
| 1912 | 2, 360, 655 | | |
| 3/1/13 | 361, 797 | | |
| Total to 3/1/13 | 13, 553, 855 | | |

Mine 8 of Terminal Coal No. I, which was opened in 1920, was sold by the trustee in reorganization in 1941. Accordingly, petitioner only transferred to South Hills in 1966 the coal lands on which mines 1 through 7 of Terminal Coal No. I had been located.

Between March 1, 1913, and November 30, 1966, Terminal Coal No. I, Terminal Coal No. II, and petitioner claimed and were allowed in the aggregate $5,442,188 of depletion deductions for the coal lands upon which mines 1 through 7 of Terminal Coal No. I were located.

OPINION

In 1902 Terminal Coal No. I purchased 10,600 acres of Allegheny County coal lands, the stock of two railroad companies, and received cash from Donnelly, Osborne, and Nicola for 139,990 shares of its $100 par value common stock plus debentures in the face amount of $4,310,000. After the sale Donnelly, Osborne, and Nicola owned all but an insignificant amount of the outstanding stock of Terminal Coal No. I. Over the years Terminal Coal No. I merged with another company to form Terminal Coal No. II, which in turn underwent a bankruptcy reorganization in 1941. Petitioner was formed as a result of the bankruptcy reorganization and it acquired therein the major part of the 10,600 acres of Allegheny County coal lands.

In 1966 petitioner transferred its interest in these coal lands for $5,000 to South Hills. We now are to decide what petitioner's basis was for these coal lands.

Assuming that petitioner is entitled to succeed to the basis of Terminal Coal No. I and that the transaction with South Hills was not a sham (the second and third issues herein) petitioner's basis for determining loss is the 1902 cost of the lands reduced by depletion deductions which were allowed or allowable since that time. Secs. 1011, 1012, and 1016.[1]

As a preliminary matter we note that the parties disagree as to the proper measure of cost basis under section 1012. Petitioner bids us to measure the basis of the coal lands by the value of the stock and notes given in the exchange while respondent asks us to look at the value of property received. As a general rule the cost basis of property purchased with other property is the fair market value of the property received. *Philadelphia Park Amusement Co.* v. *United States*, 126 F. Supp. 184 (Ct. Cl. 1954); *Halsey L. Williams*, 37 T.C. 1099 (1962). On the other hand, cases involving the purchase of property by a corporation with its own stock have uniformly held that the cost basis of the assets purchased is the value of stock given up in the exchange. *Ida I. McKinney*, 32 B.T.A. 450 (1935), affd. 87 F. 2d 811 (C.A. 10, 1937); *Lanova Corporation*, 17 T.C. 1178 (1952); *Moore-McCormack Lines, Inc.*, 44 T.C. 745 (1965).

The departure from the general rule is undoubtedly due to the fact that a corporation does not recognize any gain or loss when it pur-

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

In the case of property acquired before Mar. 1, 1913, sec. 1053 provides that the basis for determining gain shall be the greater of historical cost or Mar. 1, 1913, fair market value. Under sec. 612 and its predecessors the basis for determining cost depletion is the basis for determining gain. Accordingly, deductions for depletion may exceed historical cost in the case of property acquired before Mar. 1, 1913, if the fair market value of the property on such date was greater than its cost.

chases property with its own stock. As a practical matter the distinctions of measuring cost basis through one rule rather than the other are more theoretical than real. We have not found a case where the use of one rule rather than the other would have been crucial, nor do we think that the facts before us present such a case.

While it may be true that the stock of a going concern can be valued independently of the assets which are acquired with such stock, we think that it is nonsensical to try to look at the value of the stock separately from that of the property where, as here, all of the stock of a corporation which has never conducted any business is exchanged for property which will become all of the assets of such corporation. Any evaluation of the stock of the corporation will necessarily be based upon the income which can be expected from the property.

Regardless of the precise rule of valuation that we were attempting to apply, we have always followed the evidence of value on either side of a transaction which we considered to be the most reliable. *MacCallum Gauge Co.*, 32 B.T.A. 544 (1935) ; *Amerex Holding Corporation*, 37 B.T.A. 1169 (1938), affd. 117 F. 2d 1009 (C.A. 2, 1941) ; *Moore-McCormack Lines, Inc., supra.* We shall follow that approach here.

The fair market value of property is the price at which the property would be sold by a knowledgeable seller to a knowledgeable buyer with each party under no compulsion to act. *Commissioner* v. *Marshman*, 279 F. 2d 27, 32 (C.A. 6, 1960). We realize the difficulty of applying this standard to a transaction which occurred over seven decades ago, but we note that the parties were able to place a ponderous amount of evidence in the record concerning the 1902 value of the coal lands.

Petitioner's expert witness testified that the stock of Terminal Coal No. I had a value of $90 per share and that the debentures were worth their face value of $1,000 each as of July 1, 1902. Accordingly, Terminal Coal No. I would have paid nearly $17 million to acquire the coal lands, railroad stocks, and cash from Donnelly, Osborne, and Nicola of which about $15 million has been allocated to the coal lands by petitioner.[2] Petitioner's witness relied upon the following assumptions in determining the value of the stock and debentures: (1) That Terminal Coal No. I would have responsible management; (2) that

---

[2] In petitioner's brief it claims an additional amount of cost basis for mortgages assumed. Although there is a 1903 financial statement of Terminal Coal No. I in the record which indicates that $1,131,591 of mortgages were assumed on July 1, 1902, nowhere in the record is there evidence that the 10,600 acres of coal lands in question here were encumbered in any way. It is our belief based upon the stipulation filed by the parties that these lands were acquired by Donnelly and Nicola for cash only and that they were resold to Terminal Coal No. I only for its securities. In any event petitioner has never claimed until brief that there was any consideration given by Terminal Coal No. I except its securities, and we shall not consider such claim now.

the corporation could begin to extract coal immediately at a maximum rate of production; (3) that such maximum rate of production would be 3 million tons per year; (4) that Terminal Coal No. I could ship and sell all the coal that it could produce; and (5) that a profit of about $0.30 would be realized on every ton of coal mined by Terminal Coal No. I. We agree with petitioner that the validity of his expert's opinion of the value of the stock and debentures must be judged by facts known to exist in 1902 and not by subsequent events which proved almost every assumption used by him to be inaccurate; however, it is clear that in making his evaluation petitioner's expert resolved every contingency known to exist in 1902 in the favor of petitioner.

At the time that Terminal Coal No. I purchased the coal lands it had little capital for opening mines, the coal lands were totally undeveloped and untested, the West Side Railroad was not completed, there was a general shortage of railroad cars, and the demand for coal was unusually strong because of a strike in the coal fields of eastern Pennsylvania. Accordingly, there were a number of clouds in the sunny skies seen by petitioner's expert. In fact, the securities of Terminal Coal No. I were a very speculative investment in 1902. Any knowledgeable investor would have discounted the potential value of these securities by a considerable amount to account for the riskiness of the investment.

Although his testimony was clearly biased in respondent's favor, respondent's expert witness demonstrated the folly of trying to estimate the value of undeveloped property by looking to its anticipated earnings. By using the same information but resolving every contingency in respondent's favor and by requiring a higher rate of return on the investment in the coal lands respondent's expert opined that the coal lands were worth only $225 per acre. This figure contrasts with a value in the neighborhood of $1,400 per acre when the value of the securities used to buy the coal lands as determined by petitioner's expert is divided by 10,600. Although the approaches of both experts were somewhat different, both claimed to rely upon the 1902 value of the future earnings of the coal lands in making their estimates. The testimony of the two experts may demonstrate nothing but that capitalizing future earnings is an unsatisfactory method of resolving the question before us.

Respondent claims that $3,444,519.32 is the maximum value that can be placed on the 10,600 acres of coal lands as of July 1, 1902. This represents the amount that Donnelly and Nicola paid in cash to five individuals to acquire the coal lands shortly before selling them to Terminal Coal No. I. Respondent contends that the price of about $325

per acre paid to the five individuals represents a significant premium over the price for which comparable parcels of coal land were being sold in 1902 and that Donnelly and Nicola did nothing to increase the value of the lands. On the other hand, petitioner claims that the value of a large aggregation of coal lands is significantly greater than the sum of the values of its individual parts. Although we do not quarrel with petitioner's assertion that aggregation increases the value of coal lands, we believe that petitioner has greatly overestimated the increase in value attributable to the aggregating activities of Donnelly and Nicola.

A major theme of petitioner's argument is that respondent's evidence of prices for comparable tracts of coal lands is inapposite because such prices merely reflect the value of small tracts of land suitable only for farming unless aggregated with contiguous tracts. While it may be true that many of the transactions relied upon by respondent to set a market price for coal lands did involve the purchase of a small tract from a farmer, it is also true that Donnelly and Nicola did not buy such tracts themselves. The five individuals from whom Donnelly and Nicola bought the 10,600 acres were not farmers but coal lands aggregators. They had already assembled large holdings by the time that they sold out to Donnelly and Nicola, and they realized large profits for their efforts. We believe that the profits realized by the five individuals represent the most significant portion of the increase in value attributable to aggregation and that by putting together already large pieces of coal lands Donnelly and Nicola did not add greatly to their value.

Even if we allow a substantial markup for the efforts of Donnelly and Nicola on the $3,444,519.32 they paid for the lands, we do not believe that the fair market value of the 10,600 acres of Allegheny County coal lands exceeded $5 million on July 1, 1902. Accordingly, we hold that the cost basis of these lands of Terminal Coal No. I did not exceed $5 million.

Between March 1, 1913, and November 30, 1966, Terminal Coal No. I, Terminal Coal No. II, and petitioner claimed and were allowed in the aggregate $5,442,188 of depletion deduction for the part of the 10,600 acres of coal lands upon which mines 1 through 7 of Terminal Coal No. I were located. Therefore, even if petitioner were to prevail on the second and third issues herein, it had no unrecovered basis and suffered no loss when it sold such coal lands to South Hills in 1966.

In view of the foregoing we shall not consider the second and third issues.

*Decision will be entered for the respondent.*