SEAS SHIPPING COMPANY, Inc.,
Petitioner,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 72, Docket 30392.

United States Court of Appeals
Second Circuit.

Argued Dec. 1, 1966.

Decided Jan. 16, 1967.

John Logan O'Donnell, New York City (Roger Noall, Donald F. Johnston, Jr., and Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, on the brief), for petitioner.

Loring W. Post, Dept. of Justice, Washington, D.C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, and Harry Baum, Dept. of Justice, Washington, D.C., on the brief), for respondent.

Before FRIENDLY, SMITH and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

On March 1, 1957, the taxpayer, Seas Shipping Company, Inc., sold ten ships to Moore-McCormack Lines, Inc. [hereafter Mooremac] for $5,466,668 in cash and notes and 300,000 shares of Mooremac stock. In computing the amount realized from the sale, the taxpayer assigned a fair market value of $19.90 per share to the Mooremac stock. Mooremac resold two of the ships during 1957; and in computing its cost basis relative to the capital gains on the sales of the ships, Mooremac placed a value of $30 per share on the stock. The Commissioner determined deficiencies in the 1957 returns of both the taxpayer and Mooremac, both of whom appealed, and in due course the two matters were heard and decided by the Tax Court. The commissioner did not assert any particular value for the Mooremac stock but took the position that the value had to be the same in both cases. The Tax Court handed down two separate decisions and found as a fact in each case that the value of the stock was $30 per share.[1] The taxpayer has petitioned this court for review of the judgment against it. We affirm.

The Tax Court found that the sale of the ships was an arm's length transaction between knowledgeable parties and therefore appraised the stock by equating its value (plus cash and notes) with the value of the ten ships. To a very large extent it relied upon the evidence of the worth of the ships which it found in the sales contract itself. Although the taxpayer and Mooremac had put no total sales price in the contract, that instrument contained a list of individual dollar values for each ship; these values governed the parties' escrow arrangement, the possibility of *force majeure,* and the removal of ships from the transaction at Mooremac's option. Independent appraisers testified that the 1957 fair market value of the individual ships was as high or higher than the values listed in the contract. When Mooremac resold two of the ships during 1957, it received more than the values listed in the contract; and when the taxpayer sold two other ships, which had been removed from the transaction with Mooremac, it received more for each ship than the values earlier listed in the contract for the same vessels. The Tax Court, therefore, added together the individual ship values listed in the contract, subtracted the amount of cash and notes, and equated the result— $9,000,000—with the total value of the 300,000 shares.

While under the circumstances of this case the Tax Court's adoption of this method of valuation—the equation of two sides of a barter—is not clearly erroneous, it is a means which should be used only under certain limited conditions. The authority for it comes almost exclusively from cases involving valuation of property for which there is little or no market;[2] for example, the leading case of United States v. Davis, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962) involved the purchase by a taxpayer of his ex-wife's inchoate marital rights in his property. There are obvious dangers in evaluating the consideration involved in one side of a barter by determining the worth of the consideration on the other side. In the first place, the two sides of the barter may, for various reasons, not be equal in value. Secondly, the barter-equation method is in the nature of a bootstrap operation since there is usually no

---

1. The Tax Court decision in the present case appears at 24 CCH Tax C.Mem. 1222 (1965). The companion case is Moore-McCormack Lines, Inc., 44 T.C. 745 (1965). The opinion in the present case incorporates the findings of fact in the Moore-McCormack case to a substantial degree.

2. United States v. Davis, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962); Philadelphia Park Amusement Co. v. United States, 126 F.Supp. 184, 130 Ct. Cl. 166 (1954); United States v. General Shoe Corp., 282 F.2d 9 (6 Cir. 1960); Addressograph-Multigraph Corp., 4 CCH Tax Ct.Mem. 147 (1945); Raymond A. Hall, 10 CCH Tax Ct.Mem. 599 (1951); Jefferson Livingston, 18 B.T.A. 1184 (1930); cf., International Freighting Corp. v. Commissioner of Internal Revenue, 135 F.2d 310 (2 Cir. 1943).

logical reason to start with one side rather than the other. The Tax Court might have valued the Mooremac stock first by looking to its trading price on the New York Stock Exchange and then used that figure to compute the fair market value of the ten ships. Thirdly, the evidence on the value of one side of a barter may be no more reliable than that on the value of the other side. The determination of value by this means is particularly complex in a case such as this where the consideration moving from the seller, for example the ships transferred by Seas Shipping, became a part of the assets of Mooremac, the corporate purchaser, in which, as part of the transaction, the seller, Seas Shipping, became a 13% owner. There is nothing to indicate that the Tax Court gave any consideration to this factor.

Although there was a market for Mooremac shares on the New York Stock Exchange which the Government's stock valuation experts considered satisfactory for establishing fair market value, the Tax Court rejected these sales as having no determinative weight in proving the value of the shares. During 1957 they were traded on the New York Stock Exchange at an average price of $22.81; the total trading volume for the year was 166,000 shares, and the annual high was $25.25. If the taxpayer had resold its 300,000 shares at once, it probably would have received less than the trading price for small volumes—a phenomenon known as "blockage"—since 300,000 shares did not represent a controlling interest. It is for this reason that the taxpayer contends that the correct fair market value of the shares was $19.90.[3] The Tax Court, however, rejected the use of the trading price and blockage as determinants on the ground that an annual market of 166,000 shares was too "thin" to fix the value of a block of 300,000 shares. The court reasoned that a block of that size was worth much more than the sum of the trading prices of 300,000 individual shares because that number of shares constituted a 13% ownership in a successful corporation and was the largest block held by any Mooremac shareholder. The court also thought that the value of the shares to taxpayer was enhanced by virtue of a contemporaneous voting trust agreement which it made with certain Mooremac shareholders by which the taxpayer received control of two directorships on Mooremac's board of ten for a period of five years in return for its promise to vote its shares for the other eight in support of directors selected by the other parties to the agreement. In addition, Mooremac had agreed to continue, under the same name, the shipping line previously operated by the taxpayer and to hire certain of the taxpayer's employees.[4] Finally the court noted that the book value of Mooremac shares during 1957 was in excess of $39.

■ The Tax Court also attached evidential weight, as admissions by Seas Shipping, to a report made by Mooremac to its shareholders, which was part of the stipulated evidence in the present case, in which Mooremac stated that its stock was worth $30 a share. The court similarly treated (1) a representation made by Mooremac to the New York Stock Exchange that the stock transferred to Seas Shipping had a value of $30 a share; and (2) a statement made by Mooremac in a letter to Seas Shipping which referred to the price of the ships in dollars only. These last two items are not in the evidence nor do they show up

3. The Tax Court disregarded blockage on the ground that the taxpayer-shareholder had no need or intention to liquidate its holdings. The court's underlying assumption—that fair market value is a subjective quality varying with the particular owner of the property—is incorrect. However, there would be no blockage in this case if there were a willing buyer— one who wanted to buy a block of 300,000 shares.

4. The court's treatment of the various "collateral rights" as enhancing the value of the stock is curious. It would appear to operate the other way. That is, if the consideration for the ships was paid in cash, notes, stock and other rights, the greater the value assigned to the cash, notes and other rights, the less would be the value assigned to the stock.

anywhere in the record of this case. It appears that they were arbitrarily lifted, together with numerous other findings, out of the companion case of Moore-McCormack Lines Inc. v. C. I. R., 44 T.C. 745 (1965), in which counsel for Seas Shipping participated for limited purposes not related to these statements by Mooremac, but in which Seas Shipping was not a party, and incorporated these findings by reference in the present case. This was unsupported by a stipulation of the parties and was done *sua sponte* by the Tax Court itself.[5] This free-wheeling handling of the cases has resulted in an incomplete and somewhat disorderly record on review of this case. The petitioner objects that all of these items are unilateral statements by Mooremac and should not have been used against Seas Shipping. Concerning Mooremac's report to its shareholders, the record is barren of any evidence of ratification of or acquiescence by Seas Shipping in the statement, and the other two evidentiary matters were taken from a case in which Seas Shipping was not a party. They should not, therefore, have been considered as admissions by the taxpayer.

■ Also the court considered the fact that the Maritime Board in its approval of the sale of the ships, stated that the value of the stock was $30 per share. The parties in their briefs interpreted the Tax Court's references to the Maritime Board's approval of the agreement of sale as a conclusion of experts on the value of Mooremac stock. If the Tax Court did so, it was in error. The Maritime Board's own regulation, 46 C.F.R. § 284.2(b) (2), states, "no valuation by the Maritime Administration of a vessel acquired * * * for securities shall be deemed to be a determination * * * of the value of such securities." Also, James Tallman, the official of the Maritime Board who appeared before the Tax Court as a witness, was qualified to testify only as to ship values; and the Board's written statement of the value of the shares, standing by itself, would appear to be incompetent as the opinion evidence of experts on that issue.[6] The Taxpayer, however, has only obliquely raised that point in this court.

If, on the other hand, the Tax Court used the evidence of the approval of the agreement of sale only as proof that Seas Shipping, in accepting the approval, thereby admitted the $30 per share value,[7] then the court was on perfectly sound ground.

■ While the Tax Court's approach to the valuation of the shares has the infirmities mentioned, it is apparent that the consideration given by the court to the rights accruing to the taxpayer from the contemporaneous voting trust agree-

---

5. In its opinion the Tax Court made the following statement as to its treatment of the two cases:

"While the record in the instant case contains evidence not introduced in the *Moore-McCormack* case which does tend to support the view of petitioner herein that the value of Mooremac stock was less than $30 per share, and although we have given independent consideration to all of the evidence in the instant case in isolation from the evidence presented in the *Moore-McCormack* case, we nonetheless have concluded, and have so found as an ultimate fact, that the Mooremac stock received by petitioner had a fair market value of $30 per share.

We do not deem it necessary to restate here the reasons for our determination. An extensive discussion of the relevant factors is set forth in our report of the *Moore-McCormack* case, and the rea-

sons for concluding as we do on the record in the instant case are in no material respects different than those set forth in Moore-McCormack."[3]

"3. We recognize that in *Moore-McCormack* we relied in part upon facts of record in that case which were not a part of the record in the instant case. However, the absence of such facts in the instant case is not so material as to require a result here different from that reached in *Moore-McCormack* on the stock valuation question."

6. See, e. g., United States v. Certain Parcels of Land, etc., 261 F.2d 287 (4 Cir. 1958), discussing in detail the well established rule that tax assessments are not admissible as evidence of value in condemnation proceedings.

7. Taxpayer did object to the use of this report as evidence of its acquiescence in the Board's $30 figure.

ment, to the reports by Mooremac to its shareholders and the New York Stock Exchange that the value of the stock transferred was $30 per share, to Mooremac's letter to Seas Shipping to the same effect, and to the valuation of the stock by the Maritime Board at $30 per share, was not a determinative factor in the decision, but was nothing more than additional make-weight. It is wholly unlikely that the exclusion of these items of evidence would have altered the result in any way. Except for Mooremac's unilateral statements, they were not objected to and are only attacked as part of petitioner's complaint on appeal against the Tax Court's method of evaluating the stock. This court cannot, however, disturb that court's conclusion unless it is clearly erroneous. Maytag v. Commissioner of Internal Revenue, 187 F.2d 962 (10 Cir. 1951).

■■ Although we have found no precedent authorizing the Tax Court to use a barter-equation method where there is an active market for the property to be valued, we cannot say that the court's use of that method in this case was plain error. The character of the small transactions in Mooremac shares on the stock exchange did not reflect many of the aspects of the 300,000 share transfer in question, and we cannot say the Tax Court was clearly wrong in concluding that these small market sales were entitled to little or no weight, certainly not conclusive weight. There was present, therefore, a necessity for the Tax Court to turn to the barter-equation method. Though as more fully stated above we are of the opinion that this method should be used sparingly and with considerable caution, conditions existed which made its use feasible in this case. It is apparent that the evidence persuasively demonstrated the arm's length nature of the exchange and there were also present factors which assured the relative fairness and equality of the considerations passing from each to the other. The testimony concerning the value of the

ships was ample and convincing. If the trading price of $22.81 were taken as the stock's value, it would mean that taxpayer had sold its ships for $2,000,000 less than they were worth—a highly unlikely occurrence. Furthermore, there was an additional item of evidence considered by the Tax Court which supported the $30 result reached. In § 7(b) (5) of the sales contract, which provided for the release of consideration to Seas by the escrow agent as the ships were delivered, the parties themselves assigned a value of $30 per share to the stock. Where parties with adverse interests are at issue over the worth of property and then agree upon the dollar amount of that worth, the agreement is very persuasive evidence of value. Ullman v. Commissioner of Internal Revenue, 264 F.2d 305, 308 (2 Cir. 1959).

■■ The Taxpayer also seeks review of the Tax Court's decision about another item in its 1957 return. In August 1956, the Commandant of the United States Coast Guard ordered all vessels of a certain type to be "strapped," that is, provided with a reenforcing horizontal steel band attached to the skin of the ship, to give it additional strength and prevent cracking of the hull. During 1957 the taxpayer strapped four of its ships, and deducted the cost as a repair expense. The Tax Court, without deciding whether the strapping increased the value or useful life of the vessel, held that strapping was a capital expenditure and that it was therefore not deductible as a repair expense. The line between capital and current expenses is often a difficult one to draw, and Courts of Appeals should not overturn decisions of the Tax Court on this question unless they are manifestly wrong. P. Dougherty Co. v. Commissioner of Internal Revenue, 159 F. 2d 269; 272 (4 Cir. 1946), cert. denied, 331 U.S. 838, 67 S.Ct. 1515, 91 L.Ed. 1850 (1947). Here the strapping was a nonrecurring expenditure of a purely preventative nature, the benefits of which were to stretch out over the lifetime of

the ship. There is no reason to disturb the decision of the Tax Court on that question.

Its decision is affirmed and the petition is dismissed.

FRIENDLY, Circuit Judge (concurring):

While I wholly approve the result reached by my brothers, the case seems much easier to me than it did to the Tax Court or does to them.

When these two companies sat down to negotiate the sale of the Seas Shipping fleet to Mooremac, it must have been obvious to them and their experienced counsel that the seller's interest would be served by a lower and the purchaser's by a higher valuation of the Mooremac stock —in the case of the latter not only to obtain a high tax basis but for purposes of its operating-differential subsidy, 46 U.S.C. ch. 27, subchapter VI, 46 C.F.R. Part 284. It should have been equally obvious that the Commissioner of Internal Revenue could not be expected to tolerate a state of affairs in which Seas had the benefit of a lower figure and Mooremac of a higher one. The Sales Agreement set values for ten vessels, in addition to the two that were to be paid for in cash, and provided that upon delivery of each, Mooremac stock should be issued to Seas "at the rate of one full share for each $30, or fraction thereof, of value of the Vessels * * *," with any balance payable in cash or serial notes at Mooremac's option. The contract was subject to approval by the Federal Maritime Board and/or the Maritime Administration. The Board's letter of approval endorsed the values the parties had assigned to the vessels and referred to the Mooremac stock as being taken "@ $30.00 per share"; the Board requested each com-

pany to signify its "unqualified acceptance." When the parties joined in a telegram asking the Board to delete the figure for the stock and simply refer to the agreement, an official refused, telling Seas' lawyer "that the proposal was unacceptable because of Federal Maritime Board requirements." Seas and Mooremac thereupon returned their acceptance, Seas contenting itself with a letter agreement with Mooremac which confirmed their understanding that the terms and conditions of the basic agreement remained unchanged.

To be sure, none of these arrangements would have precluded the Commissioner, who was not a party, from asserting that the Mooremac stock was not worth $30 per share if he had been so advised.[1] But if he was satisfied to leave the parties in the bed they and the maritime regulatory agency had made, I fail to perceive any legitimate basis for one of them to complain. The situation is indeed somewhat reminiscent of the tax problems in allocating proceeds of a sale between assets or stock and a covenant not to compete, where, as Judge Waterman said in Ullman v. C. I. R., 264 F.2d 305, 308 (2 Cir. 1959), the tax desires "of the buyer and seller * * * are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with reference to the covenants, and the true value of them in money" so that "strong proof must be adduced * * * in order to overcome that declaration." See, accord, Hamlin's Trust v. C. I. R., 209 F.2d 761, 765 (10 Cir.1954); Montesi v. C. I. R., 340 F.2d 97, 100 (6 Cir. 1965). This is a fortiori true when the parties' declaration has been approved, indeed particularized and insisted upon, by an expert agency of government that has administered the payment of subsidies to both.

---

1. The provision in 46 C.F.R. § 284.2(b) (2), "No valuation by the Maritime Administration of a vessel acquired in whole or in part for securities shall be deemed

to be a determination by the Maritime Administration of the value of such securities," was doubtless intended to prevent argument on this score.