FX SYSTEMS CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2832–79.     Filed December 1, 1982.

*Thomas E. Tyre,* for the petitioner.
*Gerald A. Thorpe,* for the respondent.

OPINION

HAMBLEN, *Judge*: * Respondent determined the following deficiencies in petitioner's Federal income taxes:

| TYE Mar. 31— | Deficiencies |
|---|---|
| 1973 ................... | $129,929 |
| 1974 ................... | 65,095 |
| 1975 ................... | 8,646 |

After concessions, the sole issue for decision is the amount of petitioner's cost basis in certain assets that it purchased from Ferroxcube Corp.

All of the facts have been stipulated and are found accordingly.

Petitioner FX Systems Corp. is a Delaware corporation with its principal office in Kingston, N.Y. For the taxable years ended March 31, 1973, 1974, and 1975, petitioner timely filed its Federal corporate income tax returns with the Internal Revenue Service Center, Andover, Mass.

In June 1972, petitioner was organized in order to acquire certain assets of the Memory Systems Division of Ferroxcube Corp. (hereinafter Ferroxcube), a subsidiary of North American Phillips Corp. (hereinafter NAPCO). The principal business of Ferroxcube's Memory Systems Division was the manufacture and sale of memory systems for computers. During 1971, the management of Ferroxcube and NAPCO decided to sell the Memory Systems Division because, in their opinion and according to their financial records, it was not a profitable operation. They also decided that if they were unable to find a buyer for all of the assets of Ferroxcube's Memory Systems Division those assets would be scrapped for salvage value. As of December 31, 1971, Ferroxcube's Memory Systems Division was not accepting new orders, but was simply filling existing orders and servicing equipment under its warranty agreements.

When Ferroxcube was unable to find a buyer for its Memory Systems Division, four key management employees of the Memory Systems Division decided to form a corporation to

---

*This case was submitted fully stipulated to Judge Sheldon V. Ekman, who died on Jan. 18, 1982. It was reassigned to Judge Lapsley W. Hamblen, Jr., for disposition by order of the Chief Judge.

purchase the division's assets. Consequently, on June 28, 1972, they incorporated petitioner. Petitioner's authorized capital stock consisted of 700,000 shares of voting common stock, 15,000 shares of nonvoting series A preferred stock, and 15,000 shares of nonvoting series B preferred stock.

Petitioner's common stock is entitled to one vote per share. Its series A preferred stock is nonvoting, is entitled to an $8 cumulative annual dividend commencing on January 1, 1974, and has a redemption price of $100 per share. Such stock is redeemable by the corporation at any time, but is only redeemable by the holder thereof from the proceeds of any public offering of common stock or securities convertible into common stock. Petitioner's series B preferred stock is nonvoting and is entitled to a $5 cumulative annual dividend commencing on January 1, 1974. The series B preferred stock is junior to the series A preferred stock and has a redemption price of $100 per share until December 31, 1973, and redemption price of $150 per share thereafter. Each share of series B preferred stock is convertible into at least 45 shares of common stock, and, upon conversion, the holder may be entitled to more than 45 shares of common stock if certain antidilution provisions are applicable. While the corporation may redeem the series B preferred stock at any time after it has redeemed the series A preferred stock, the holder of the series B preferred stock is entitled to exercise his option to convert such stock into common stock after receiving notice of the redemption. The series B preferred stock is only redeemable by the holder thereof from the proceeds of the second or subsequent public offering of common stock or securities convertible into common stock.

Pursuant to a "Purchase and Sale Agreement" dated June 28, 1972 (hereinafter the purchase agreement), petitioner agreed to purchase, and Ferroxcube agreed to sell, the bulk of the assets of Ferroxcube's Memory Systems Division. With respect to the price payable for those assets, the purchase agreement provides as follows:

2.01 Tht [sic] Total Purchase Price for the sale of all the assets referred to in Paragraph 1.01 and 1.02 above shall be Two Hundred Thousand Dollars ($200,000) plus the preferred stock as defined in Section 8.02(b) and (c).

2.02 If on the date of closing, the amount of inventory to be transferred to Buyer hereunder, valued on the basis of Seller's gross book cost is found to be

greater than One Million, Two Hundred and Seventy-Seven Thousand Dollars ($1,277,000), less:

(i) cancellation, material and charges incurred prior to May 1, 1972;

(ii) inventory not being transferred pursuant to paragraph 1.03 (v); and

(iii) the value of two Add-on Memories being retained by Seller,

the total purchase price will be increased correspondingly.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

8.02 At the Closing, Buyer shall in payment of the Purchase Price transfer to Seller as follows:

(a) Buyer will deliver to Seller a certified check in good New York funds in the amount of Two Hundred Thousand Dollars ($200,000).

(b) Five hundred (500) shares of the Buyer's "Series A" 8% preferred stock, $1.00 par value, which when issued and outstanding shall constitute validly issued and outstanding shares, fully paid and non-assessable. Said cumulative Series A stock will accrue dividends commencing on January 1, 1974, said dividends payable quarterly thereafter. Series A preferred stock shall have a redemption or liquidation value of $50,000, and shall be redeemed from the proceeds of any subsequent public offering of stock or securities convertible into stock of Buyer, and may be purchased or retired at any time by the Buyer. Said Series A stock will be the senior equity security of the Seller, and has preference upon liquidation over all other classes of stock.

(c) Five hundred shares of the Buyer's "Series B" 5% convertible preferred stock, $1.00 par value, which when issued and outstanding shall constitute validly issued and outstanding shares fully paid and non-assessable. Said cumulative "Series B" stock will accrue payable quarterly. Series B preferred stock shall have a liquidation and redemption value of $50,000, until December 31, 1973 after which time the aggregate liquidation and redemption will increase to $75,000; shall be junior to Series A preferred stock, and shall share in liquidation Pari Passu with other classes of preferred stock. Series B stock may be redeemed by Buyer subject to the following conditions:

1. All Series A preferred Stock of Buyer owned by Seller has been redeemed in full, and

2. Thirty (30) day written notice of intention to redeem has been given to holder during which thirty (30) day period the holder shall have an absolute right to convert into fully paid and non-assessable shares of common stock of Buyer.

At the option of the holder, Series B stock shall be redeemable from the proceeds of any public offering (subsequent to the first public offering) of stock or securities convertible into stock of buyer, at which time the conversion right will terminate.

Series B shall be convertible at any time into 20,000 shares of common stock, one (1) cent par value, or in the case of an adjustment of the number of shares pursuant to Paragraph 8.03, then at the number as last adjusted and in effect.

(d) Within three days after the determination of the Excess Inventory Value (if any), Buyer will deliver to Seller a six month non-interest bearing

Note dated the Closing Date in substantially the form as Exhibit A attached hereto; and in a principal amount equal to the amount of the Excess Inventory Value as determined under paragraph 2.02.

In addition, the purchase agreement provides that as long as any of the preferred stock held by Ferroxcube remains outstanding, petitioner may not declare any dividends on its common stock or distribute any property to the holders of such stock unless all of the dividends on the preferred stock are paid and, after the dividend or distribution with respect to the common stock, petitioner's assets exceed its liabilities by a specified amount.

On August 26, 1972, petitioner consummated its purchase of the assets of Ferroxcube's Memory Systems Division. At that time, petitioner paid Ferroxcube $200,000 in cash, executed a promissory note in the amount of $28,000 to cover the value of excess inventory as provided in section 2.02 of the purchase agreement, and issued to Ferroxcube 500 shares of series A preferred stock and 500 shares of series B preferred stock.

At the time it purchased the assets of Ferroxcube's Memory Systems Division, petitioner engaged Marshall & Stevens, Inc., a firm of recognized valuation engineers and appraisers, to determine the fair market value of those assets. According to the report submitted by Marshall & Stevens, Inc., the fair market value of such assets as of August 19, 1972, was as follows: [1]

| | | | |
|---|---|---|---|
| (a) | Inventory | | $475,000 |
| (b) | Machinery, equipment, furniture and fixtures | $417,080 | |
| | Less: Setup costs | 20,000 | 397,080 |
| | Total | | 872,080 |

At the time of the sale, 345,000 shares of petitioner's common stock had already been sold and another 40,000 shares had been subscribed. Petitioner's stock has never been publicly traded on any market. As of March 31, 1975, none of the series A or B preferred stock issued by petitioner to

---

[1] Respondent has conceded that the assets had a fair market value equal to that determined pursuant to the appraisal by Marshall & Stevens, Inc.

Ferroxcube had been redeemed or converted into common stock.

On its income tax returns for the taxable years ended March 31, 1973, 1974, and 1975, petitioner used the fair market value of the inventory purchased from Ferroxcube (i.e., $475,000) as its basis for determining its cost of goods sold. Petitioner also used the fair market value of the machinery, equipment, and furniture and fixtures that it purchased from Ferroxcube (i.e., $397,080) as its basis for depreciation purposes on those returns. In the notice of deficiency, respondent determined that petitioner was not entitled to use the fair market value of such assets as its cost basis therefor. Respondent found that the value of the series A and series B preferred stock issued to Ferroxcube was equal to the total redemption price therefor, $50,000 each, and, therefore, he determined that the purchase price of the assets and petitioner's cost basis therein was only $328,000, allocated among the assets as follows: [2]

> Inventory ............................... $174,268
> Machinery, equipment,
>     furniture, and fixtures ........... 145,632
> "Going Concern" value ............ [3]8,100

We must determine whether petitioner's cost basis in the assets that it purchased from Ferroxcube is equal to the fair market value of those assets.

Petitioner maintains that the value of the preferred stock issued to Ferroxcube is not ascertainable. Consequently, petitioner argues that in determining the cost of the assets it purchased from Ferroxcube, the value of the preferred stock, cash, and promissory note that it gave to Ferroxcube should be presumed to be equal to the value of the assets that it received in exchange therefor. Respondent, on the other hand, contends that it is inappropriate to apply such a presumption to the instant case. According to respondent, Ferroxcube was not in a position to bargain for property of equal value because petitioner was the only party interested in buying the assets of

---

[2]The purchase price was apportioned among the assets according to their relative fair market value as determined pursuant to the appraisal by Marshall & Stevens, Inc.

[3]Petitioner has conceded that the going-concern value of assets it purchased from Ferroxcube was $8,100.

Ferroxcube's Memory Systems Division. Furthermore, respondent maintains that the preferred stock issued to Ferroxcube did have an ascertainable value equal to the redemption price of such stock. For the reasons set forth below, we hold for respondent.

Generally, the cost basis of property purchased with other property is the fair market value of the property received in the exchange. *Philadelphia Park Amusement Co. v. United States*, 130 Ct. Cl. 166, 126 F. Supp. 184 (1954); *Williams v. Commissioner*, 37 T.C. 1099 (1962). On the other hand, where a corporation acquires property in exchange for its own stock, the cost basis of such property is the value of the stock given up in the exchange.[4] *Simmonds Precision Products, Inc. v. Commissioner*, 75 T.C. 103 (1980); *Pittsburgh Terminal Corp. v. Commissioner*, 60 T.C. 80 (1973), affd. per order 500 F.2d 1400 (3d Cir. 1974). Nevertheless, where stock is exchanged for property pursuant to an arm's-length transaction, the courts have, in certain instances, presumed that the value of such stock equaled the value of the property received in exchange therefor. See *Pittsburgh Terminal Corp. v. Commissioner, supra*; *Moore-McCormack Lines, Inc. v. Commissioner*, 44 T.C. 745 (1965). See also *Philadelphia Park Amusement Co. v. United States, supra.* This is sometimes referred to as the barter-equation method of valuation.

Relying on *Pittsburgh Terminal Corp. v. Commissioner, supra*, petitioner insists that we apply the barter-equation method of valuation and determine the value of the preferred stock issued to Ferroxcube and correspondingly its cost basis in the assets it received from Ferroxcube by reference to the value of those assets. In *Pittsburgh Terminal Corp.*, a newly formed corporation received virtually all of its assets in exchange for all but an insignificant portion of its stock. To ascertain the corporation's basis in the property received, this Court determined the value of such stock by reference to the fair market value of the property stating:

While it may be true that the stock of a going concern can be valued

---

[4]Such a transaction is treated differently because under sec. 1032, I.R.C. 1954, a corporation does not realize any gain or loss when it purchases property with its own stock. See *Pittsburgh Terminal Corp. v. Commissioner*, 60 T.C. 80, 87–88 (1973), affd. per order (3d Cir. 1974).

independently of the assets which are acquired with such stock, we think that it is nonsensical to try to look at the value of the stock separately from that of the property where, as here, all of the stock of a corporation which has never conducted any business is exchanged for property which will become all of the assets of such corporation. Any evaluation of the stock of the corporation will necessarily be based upon the income which can be expected from the property.

Regardless of the precise rule of valuation that we were attempting to apply, *we have always followed the evidence of value on either side of the transaction which we considered to be the most reliable.* * * * [60 T.C. at 88; emphasis added.]

On the basis of the record before us, we find that *Pittsburgh Terminal Corp.* is distinguishable. First, in *Pittsburgh Terminal Corp.*, all but an insignificant portion of the corporation's stock was given as consideration for the property, and such property thereafter represented all of the corporation's assets. Therefore, the value of the corporation's stock necessarily reflected the value of the underlying corporate assets. Second, and more importantly, we do not think that the fair market value of the property that petitioner received from Ferroxcube constitutes reliable evidence of the value of the preferred shares that petitioner issued to Ferroxcube. In *Pittsburgh Terminal Corp.*, we emphasized that we have always followed reliable evidence of value on either side of the transaction, and therein we found that the value of the property received in exchange for the corporation's stock represented reliable evidence of the value of such stock. Obviously, we reached this conclusion because it is normally presumed that properties exchanged in an arm's-length transaction will be equal in value. In the instant case, however, respondent has challenged this presumption and the record supports his position.

During 1971, Ferroxcube and NAPCO, its parent, decided to sell Ferroxcube's Memory Systems Division because they believed it was an unprofitable operation. If, however, they were unable to sell the Memory Systems Division, they had decided to scrap its assets for salvage value. After Ferroxcube had been unable to find a buyer, four key management employees of the Memory Systems Division formed petitioner to purchase the division's assets. Consequently, it appears that

petitioner was the only party interested in purchasing the Memory Systems Division,[5] leaving Ferroxcube with the choice of selling the division to petitioner or scrapping its assets for salvage value. Since petitioner had been organized by four employees of the Memory Systems Division who must have known the options that Ferroxcube faced, it is clear that Ferroxcube was placed at a distinct disadvantage in negotiating a sale to petitioner. Under these circumstances, we cannot find that petitioner and Ferroxcube were dealing at arm's length in the ordinary sense of that term. See *C. G. Meaker Co. v. Commissioner*, 16 T.C. 1348 (1951). Fair market value has been defined as the price at which property would be sold by a knowledgeable seller to a knowledgeable buyer with neither party under any compulsion to act. *Pittsburgh Terminal Corp. v. Commissioner, supra* at 88. We believe, in light of the lack of any evidence to the contrary, that respondent acted reasonably in assuming that Ferroxcube found itself forced to sell the Memory Systems Division's assets to petitioner at a price below their fair market value rather than scrapping those assets for salvage value.[6]

Furthermore, the record indicates that the preferred stock that petitioner issued to Ferroxcube was worth nowhere near the amount that petitioner would have us find. The series A and series B preferred stock issued to Ferroxcube were redeemable by petitioner for a total price of $100,000. To accept petitioner's position, we would have to find that such preferred stock had a value of $652,180.[7] We find it difficult to believe that stock worth $652,180 would be redeemable for only $100,000. Although petitioner maintains that the conversion privilege that accompanied the series B preferred stock was of considerable value, the record clearly shows that the

[5]Unfortunately, the record does not indicate why Ferroxcube was unable to find another buyer.

[6]On brief, petitioner has attempted to equate the term salvage value as used in the stipulation of facts with the fair market value of the assets received from Ferroxcube, arguing that the sale Ferroxcube made to petitioner constituted a disposition of those assets for their salvage value. Not only is this argument farfetched, but it is wholly unsupported by the record.

[7]This figure represents the difference between the consideration paid by petitioner attributable to the cash and promissory note ($228,000) and the fair market value of the assets received by petitioner, including the going-concern value of those assets ($880,180).

conversion privilege could not account for this discrepancy. At the time of sale, 345,000 shares of petitioner's common stock were outstanding and another 40,000 had been subscribed, while the series B preferred stock issued to Ferroxcube was only convertible into 22,500 shares of common stock. Moreover, if anything, the record indicates that at the time of the sale 22,500 shares of petitioner's common stock were worth considerably less than the $50,000 redemption price of the series B preferred stock issued to Ferroxcube.

Petitioner contends that *Pittsburgh Terminal Corp.* is not distinguishable from the instant case because as long as the preferred stock issued to Ferroxcube is outstanding, the restrictions placed upon petitioner's common stock under the purchase agreement render such stock valueless, and, therefore, for all practical purposes the preferred stock was petitioner's only outstanding stock. This argument is untenable. Regardless of the restrictions, petitioner's common stock was the only stock that had the right to vote. While the purchase agreement restricted the payment of dividends or the distribution of property to the common stockholders, it did not totally prohibit such distributions but simply set forth conditions that had to be satisfied prior thereto. Moreover, the fact remains that petitioner, who was controlled by the shareholders of its common stock, had the right to redeem all of the preferred stock issued to Ferroxcube for only $100,000.

Finally, petitioner argues that it negotiated a purchase of the assets of Ferroxcube's Memory Systems Division at the book value of those assets to Ferroxcube, but used the appraised fair market value of those assets as the cost basis therefor even though that amount was substantially less than the negotiated purchase price, that is, the book value. Therefore, petitioner insists that the cost of the assets that it purchased is at least equal to the fair market value of those assets. We, however, are unable to find anything in the record that establishes that the parties negotiated a sale at book value. Significantly, petitioner failed to produce any evidence whatsoever with respect to the negotiations. Nor did petitioner present any evidence that would indicate what Ferroxcube believed the preferred stock was worth or what value Ferroxcube assigned to the preferred stock for tax purposes. Indeed,

there is absolutely no evidence in the record with respect to Ferroxcube's treatment of this transaction.

In conclusion, under the circumstances presented herein we are not required to use the barter-equation method of valuation to value the preferred stock that petitioner issued to Ferroxcube. In *Seas Shipping Co. v. Commissioner*, 371 F.2d 528, 529 (2d Cir. 1967), affg. a Memorandum Opinion of this Court, the Court of Appeals stated as follows:

There are obvious dangers in evaluating the consideration involved in one side of a barter by determining the worth of the consideration of the other side. *In the first place, the two sides of the barter may, for various reasons, not be equal in value.* * * * [Emphasis added.]

On the basis of the record, we must conclude that this is such a case. See *C. G. Meaker & Co. v. Commissioner, supra.* Although petitioner has asserted that the value of the preferred stock is not ascertainable, respondent has valued such stock and petitioner has not offered any evidence to rebut that valuation aside from the use of the barter-equation method. Since we have rejected the use of this method of valuation in the instant case, we find that petitioner has failed to meet its burden of proof and sustain respondent's determination. See Rule 142(a), Tax Court Rules of Practice and Procedure. We have considered all of petitioner's other arguments and found them unpersuasive.

To reflect the foregoing,

*Decision will be entered under Rule 155.*