T.C. Memo. 1995-606

UNITED STATES TAX COURT

LIQUID AIR CORPORATION AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14574-93.                    Filed December 26, 1995.

<u>Emilio A. Dominianni</u> and <u>Edmund S. Cohen</u>, for petitioner.

<u>Gail A. Campbell</u>, <u>Diane P. Thaler</u>, and <u>Kevin C. Reilly</u>, for
respondent.

MEMORANDUM OPINION

RUWE, <u>Judge</u>:  Respondent determined a deficiency of $93,767
in petitioner's 1979 Federal income tax.  The sole issue for
decision is whether petitioner overstated the basis of assets
acquired from Chemetron Corp. in 1979 by $3,081,584.

Some of the facts have been stipulated and are so found.

The stipulation of facts and attached exhibits are incorporated herein by this reference.  At the time the petition was filed in this case, petitioner's principal place of business and principal office were located in Walnut Creek, California.

## Background

During the relevant years, petitioner, Liquid Air Corp., was the common parent of an affiliated group of corporations. Petitioner was, at all relevant times, engaged principally in the business of producing, selling, and distributing industrial gases and welding products in the United States and various foreign countries.

On June 5, 1978, petitioner entered into a written executory contract (Contract) with the Chemetron Corp. (Chemetron) to purchase certain assets of the Industrial Gases Division (IGD) of Chemetron.  At the time of the Contract, Chemetron was a wholly owned subsidiary of Allegheny Ludlum Industries, Inc. (Allegheny).  The Contract was the result of an arm's-length negotiation among representatives of petitioner, Chemetron, and Allegheny.  Michael V. Breber, petitioner's executive vice president and chief operating officer, was in charge of negotiating the purchase of the assets of the IGD on petitioner's behalf.  Before the transaction could close, however, approval of the transaction by the Federal Trade Commission (FTC) was necessary.

The purchase price to be paid by petitioner was set forth in paragraph 2 of the Contract as follows:

> (i) $60,030,000 to be paid by the delivery to the Seller [Chemetron] of 3,335,000 original issue shares of the Buyer's [petitioner's] Common Stock, no par value, which shares have been valued by the parties at a fair market value of $60,030,000 based upon recent market values of the Buyer's Common Stock in the over-the-counter market, the present book value of the Buyer's Common Stock, the size of the block of shares to be issued to the Seller, the restrictions upon transfer of such shares and the limited size of the public market for the Buyer's shares, and (ii) the Buyer's assumption and agreement to pay or discharge the Seller's liabilities and obligations to the extent provided in Paragraph 4(a) hereof; the foregoing purchase price reflecting the fair market value of the assets of the Business as set forth in the report of Valuation Research Corporation, dated March 1, 1978, containing, among other things, an appraisal of the industrial gas assets of the Seller which are used in the Business, a copy of which has previously been delivered to the Buyer.

The parties to the Contract obtained two outside appraisals in connection with the transaction. First, in a letter dated June 2, 1978, addressed to the board of directors of Allegheny, Smith Barney, Harris Upham & Co. (Smith Barney) concluded that the fair market value of 3,335,000 shares of petitioner's common stock was approximately $60,000,000 as of May 18, 1978. In so concluding, Smith Barney considered the effect of the following factors on the value of petitioner's common stock: (1) The shares to be received by Allegheny in the transaction would be restricted stock; (2) upon receipt of the stock, Allegheny would hold a minority interest in petitioner equal to approximately 32

percent; and (3) the volume of trading in petitioner's stock on the over-the-counter market is very thin.[1]  Next, in a letter dated September 18, 1978, addressed to Mr. Breber, Goldman, Sachs & Co. (Goldman Sachs) concluded that the fair market value of 3,335,000 shares of petitioner's common stock was $60,697,000 as of April 27, 1978.  Goldman Sachs started with the last bid price on the over-the-counter market on April 27, 1978, of $26 per share,[2] and applied a block discount of 30 percent to account for the thin public market and the restricted nature of the stock to be transferred.  The parties to the Contract did not obtain an appraisal of petitioner's shares as of the closing date of the transaction.[3]

The closing of the transaction contemplated in the Contract occurred on March 28, 1979, approximately 10 months after the signing of the Contract.  Paragraph 22(m) of the Contract provided that certain adjustments were to be made upon the closing of the transaction:

---

[1]The average annual trading volume of petitioner's shares from November 1975 through March 1978 was approximately 630,000 shares.  Thus, the 3,335,000 shares to be issued pursuant to the terms of the Contract represented more than five times the annual trading volume of petitioner's shares.

[2]We note that the bid price on the over-the-counter market on Mar. 29, 1979, the day after the closing, was also $26 per share.

[3]There is some evidence that the IRS conducted an appraisal of petitioner's stock as of the closing date in connection with its audit of Allegheny.  The IRS agent proposed an increase in Allegheny's gain on the sale of the IGD's assets in the amount of $16,675,000 to account for an increase in the fair market value of petitioner's stock.  However, the appraisal is not in the record, nor is there any evidence to explain the procedures and conclusions of the appraiser.  Moreover, the adjustment proposed by the IRS agent was subsequently reversed by the Appeals Division of the IRS.

(m) <u>Post-Closing Adjustment</u>. The parties acknowledge that the Buyer [petitioner] shall be entitled to (i) 25% of the pre-tax earnings of the Business (after the charges set forth on Schedule Q) from January 1, 1978 to July 2, 1978 and (ii) 50% of the pre-tax earnings of the Business (after the charges set forth in Schedule Q) from July 3, 1978 to the day immediately preceding the Closing Date. Within 60 days after the Closing Date, the parties shall determine the amount of any adjustment required to enable the Buyer to receive the benefit of its share of the profits as set forth above. In the event the Seller [Chemetron], as of the Closing Date, has withdrawn less than the amount to which it is entitled, the Buyer shall pay to the Seller the amount of such deficiency. In the event the Seller, as of the Closing Date, has withdrawn more than the amount to which it is entitled, the Seller shall pay to the Buyer the amount of such excess.
* * *

The final settlement adjustments made after closing in accordance with the above provision were calculated by Allegheny and set forth in a letter dated June 21, 1979:

```
December 31, 1977 equity                                 $69,285,404.00
1978 earnings $10,028,071.48 x 25% = 2,507,017.87
1979 earnings $ 2,298,266.00 x 25% =   574,566.50    3,081,584.37
Total equity required                                    72,366,988.37
Equity at 3/31/79                                        72,045,669.78
  Amount due from Chemetron                                 $321,318.59
```

The $321,318.59 net amount due from Chemetron was paid to petitioner by means of a wire transfer to the IGD's account. The remainder of the $3,081,584.37 that was determined to be owed to petitioner was paid in the form of a higher net asset value that

was delivered to petitioner at closing.[4]

Prior to the closing, approximately 80 percent of petitioner's stock was beneficially owned, assuming conversion of certain preferred stock, by L'Air Liquide S.A. (L'Air Liquide), a French corporation. Approximately 2 percent of petitioner's stock was owned by officers and directors of petitioner. The remaining 18 percent of petitioner's stock was publicly owned and was traded on the over-the-counter market. After the closing,

---

[4]We note that the percentage of post-July 1978 earnings provision of the Contract was not literally followed. On brief, petitioner explains this as follows:

We point out, for purposes of completeness, that Chemetron's contractual obligation to deliver 50 percent of the pre-tax earnings of the IGD Division from July 3, 1978 to the day immediately preceding the closing merely reflected the parties' initial expectation (ultimately unrealized) that the closing would take place in the third quarter of 1978, but before the record date for the third quarter LAC dividend. That is, the parties expected that Chemetron would be receiving the full third quarter dividend from LAC even though it would only have owned the LAC stock for a portion of the third quarter. Thus, the "50 percent of pre-tax earnings" amount referred to in the Contract merely refers to (i) the 25 percent of pre-tax earnings balancing, or mirror, amount negotiated by the parties, plus (ii) an additional 25 percent of pre-tax earnings from the beginning of the third quarter dividend period to the anticipated closing date, representing the portion of the third quarter LAC earnings that would be paid as a dividend to Chemetron after the (originally anticipated) closing date even though allocable to a period prior to which Chemetron would actually own the relevant LAC shares. It is apparent that the parties sought carefully and minutely to negotiate the economics of the transaction. However, the closing of the transaction ultimately did not take place prior to the record date for the third quarter dividend for 1978, as the parties had initially expected. Rather, as a result of the protracted FTC investigation, the closing actually took place on March 28, 1979--i.e., at the close of the first quarter of 1979, but after the record date for the first quarter dividend. Therefore, Chemetron never had to "disgorge" a portion of a dividend allocable to a period during which it did not actually own the LAC stock, and no "50% of pre-tax earnings" amount ever had to be calculated or paid.

L'Air Liquide's beneficial ownership of petitioner's stock fell to approximately 55 percent. Approximately 32 percent was owned by Chemetron, leaving maximum public ownership at approximately 13 percent.

## Discussion

The issue we must decide is whether petitioner overstated the basis of the assets acquired from Chemetron by $3,081,584. The $3,081,584 represents the amount of the post-closing adjustment provided for in paragraph 22(m) of the Contract. Respondent argues that petitioner's basis in the property for depreciation purposes is the cost of such property, and that the cost of the property was clearly set forth in paragraph 2 of the Contract as $60,030,000 (the fair market value of 3,335,000 original issue shares of petitioner). Petitioner, on the other hand, argues that the post-closing adjustment was intended to equate any increase in the fair market value of petitioner's stock between the Contract date and the closing date with the IGD assets to be delivered to petitioner. Because the adjustment mechanism was bargained for at arm's length, petitioner argues that the additional value transferred after closing should be reflected in petitioner's cost basis of the assets. Petitioner bears the burden of proving that it is entitled to the additional

$3,081,584 in basis.  Rule 142(a);[5] <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

The basis upon which depreciation deductions are allowed is the basis determined under section 1012.  Secs. 167(g), 1011(a). Section 1012 provides in pertinent part:  "The basis of property shall be the cost of such property".  Generally, the cost basis of property purchased with other property is the fair market value of the property received in the exchange.  <u>Philadelphia Park Amusement Co. v. United States</u>, 130 Ct. Cl. 166, 171, 126 F. Supp. 184, 188 (1954); <u>Williams v. Commissioner</u>, 37 T.C. 1099, 1106 (1962).  On the other hand, where a corporation acquires property in exchange for its own stock, the cost basis of such property is the fair market value of the stock given up in the exchange.[6]  <u>FX Sys. Corp. v. Commissioner</u>, 79 T.C. 957, 963 (1982); <u>Pittsburgh Terminal Corp. v. Commissioner</u>, 60 T.C. 80, 87 (1973), affd. without published opinion 500 F.2d 1400 (3d Cir. 1974).

Fair market value has been defined as "the price at which the property would change hands between a willing buyer and a

---

[5]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the taxable year in issue.

[6]This departure from the general rule is due to the fact that under sec. 1032, a corporation does not recognize any gain or loss when it receives property in exchange for its own stock.  <u>FX Sys. Corp. v. Commissioner</u>, 79 T.C. 957, 963 n.4 (1982); <u>Pittsburgh Terminal Corp. v. Commissioner</u>, 60 T.C. 80, 87-88 (1973), affd. without published opinion 500 F.2d 1400 (3d Cir. 1974).

willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; see also Bankers Trust Co. v. United States, 207 Ct. Cl. 422, 437, 518 F.2d 1210, 1219 (1975). Where the property to be valued consists of corporate stock that is listed on an established securities market, the average exchange price quoted on the valuation date generally provides the most accurate measure of fair market value. Bankers Trust Co. v. United States, 207 Ct. Cl. at 437, 518 F.2d at 1219; Amerada Hess Corp. v. Commissioner, 517 F.2d 75, 83 (3d Cir. 1975), revg. White Farm Equip. Co. v. Commissioner, 61 T.C. 189 (1973); sec. 20.2031-2(b)(1), Estate Tax Regs. However, where stock is exchanged for property pursuant to an arm's-length transaction, the courts have, in certain instances, presumed that the value of such stock equals the value of the property received in exchange therefor, a method often referred to as the "barter-equation method" of valuation. Southern Natural Gas Co. v. United States, 188 Ct. Cl. 302, 352-353, 412 F.2d 1222, 1252 (1969); Pittsburgh Terminal Corp. v. Commissioner, supra at 88; Moore-McCormack Lines, Inc. v. Commissioner, 44 T.C. 745, 757 (1965). Regardless of the precise rule of valuation that we are attempting to apply, this Court has always followed the evidence of value on either side of a transaction that we consider to be the most reliable. Pittsburgh Terminal Corp. v. Commissioner, supra at 88; Amerex Holding Corp. v. Commissioner, 37 B.T.A.

1169, 1190 (1938), affd. per curiam 117 F.2d 1009 (2d Cir. 1941). We see no reason to depart from that approach here.

In the present case, the only appraisals of petitioner's stock were made as of dates before the Contract date. The parties to the Contract did not seek an appraisal of the stock as of the date of the closing. However, where experienced businessmen or women with adverse interests are negotiating at arm's length, and they agree upon the value of property to be exchanged, the agreement is very persuasive evidence of value. Southern Natural Gas Co. v. United States, 188 Ct. Cl. at 358, 412 F.2d at 1251, 1255-1256; Seas Shipping Co. v. Commissioner, 371 F.2d 528, 532 (2d Cir. 1967), affg. T.C. Memo. 1965-240.

In the instant case, the parties do not dispute that the Contract was the result of an arm's-length negotiation among representatives of petitioner, Chemetron, and Allegheny. The Contract provided for a purchase price of 3,335,000 shares of petitioner's common stock, which had been valued by the parties at $60,030,000. In addition, the Contract provided that certain adjustments were to be made upon the closing of the transaction. Pursuant to the adjustment provision, petitioner was entitled to receive (i) 25 percent of the pre-tax earnings of the IGD from January 1, 1978 to July 2, 1978, and (ii) 50 percent of the pre-tax earnings of the IGD from July 3, 1978, to the day immediately preceding the closing date. Petitioner received a total of $3,081,584 in additional IGD assets pursuant to this provision.

Respondent argues that because the Contract states that the purchase price is $60,030,000 to be satisfied by the delivery of 3,335,000 shares of petitioner's stock, petitioner is bound by such stated price. We have consistently held that where taxpayers have executed a written agreement that provides for specific terms of a transaction in which the tax consequences are at issue, they must adduce "strong proof" to establish a position at variance with the clear language of their written agreement. Peterson Mach. Tool, Inc. v. Commissioner, 79 T.C. 72, 81 (1982), affd. per curiam by order (10th Cir., Apr. 2, 1984); Lucas v. Commissioner, 58 T.C. 1022, 1032 (1972). However, petitioner is not seeking to vary the terms of its agreement. The Contract clearly provides for an adjustment in the value of the assets to be received from Chemetron. Rather, petitioner is attempting to show that the post-closing adjustment reflects the parties' estimation of the anticipated increase in the purchase price. Because petitioner is merely attempting to construe an ambiguous term of the agreement, the "strong proof" rule does not apply. Peterson Mach. Tool, Inc. v. Commissioner, supra at 82.[7] Thus,

---

[7]Respondent urges us to apply the standard of proof adopted by the Court of Appeals for the Third Circuit in Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965). Under the Danielson rule, "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." Id. at 775. We note that the stricter Danielson rule is also inapplicable when the agreement is ambiguous. Smith v. Commissioner, 82 T.C. 705, 713-714 (1984).

we need only determine whether petitioner has met its usual burden of proof with respect to the purchase price of the assets of the IGD. Rule 142(a).

Mr. Breber, who was in charge of negotiating the purchase of the assets of the IGD on petitioner's behalf, testified[8] that the purpose behind the post-closing adjustment provision in the Contract was to balance the anticipated increase in the value of petitioner's shares from the Contract date until the closing date with additional assets of the IGD to be delivered at closing.

According to Mr. Breber, the industrial gas industry, of which petitioner and Chemetron were a part, is a capital intensive industry. In order to maintain profitability, a certain percentage of annual earnings must be reinvested in fixed assets. Petitioner's policy was to retain approximately 25 percent of its pre-tax earnings, which was generally in accordance with the industry norm. An additional 25 percent of petitioner's pre-tax earnings was generally paid out to the shareholders as dividends. Because the transaction required the approval of the FTC before it could close, the parties anticipated a delay between the signing of the Contract and the closing of the transaction. During the course of such delay, Mr.

---

[8]Because Mr. Breber would be unavailable to testify at trial, the parties examined him under oath before an independent stenographer. The examination was recorded, and a transcript thereof was admitted in evidence. The parties stipulated that if Mr. Breber were called to testify at trial, his testimony would be as set forth in the admitted transcript.

Breber anticipated that both petitioner and Chemetron would continue to produce net positive earnings and reinvest them in accordance with the industry norm, thus increasing the value of both the stock and the assets to be exchanged. According to Mr. Breber, the post-closing adjustment was intended to reflect this anticipated increase.

We find Mr. Breber's explanation of the purpose of the post-closing adjustment to be credible and consistent with the language of the provision itself and with the other evidence in the record.[9] Moreover, the fact that Chemetron actually transferred an additional $3,081,584 in value after the closing provides strong support for Mr. Breber's explanation. The only natural conclusion is that Allegheny and Chemetron considered the stock to have equivalent value, for it is difficult to imagine that sophisticated businessmen were "either in effect duped into giving * * * [an additional $3,081,584 in assets], or were indulging in some kind of charitable exercise." Southern Natural Gas Co. v. United States, 188 Ct. Cl. at 351, 412 F.2d at 1251.

Upon consideration of all the evidence in the record, we conclude that the value of assets transferred by Chemetron upon closing, including the additional $3,081,584 transferred pursuant

---

[9]We note that the acquisition of the IGD from Chemetron would make petitioner a national, as opposed to a regional, supplier of industrial gases. Such acquisition could not take place without FTC approval. As of the closing date, FTC approval had been obtained, which removed this contingency. We believe that these factors would have a positive effect on the fair market value of petitioner's stock.

to the post-closing adjustment provision, is the best evidence of the fair market value of petitioner's stock at the time of issue. Accordingly, we hold that petitioner properly included the $3,081,584 in its cost basis.

<u>Decision will be entered for petitioner</u>.